**SAM BLOOM ADVERTISING AGENCY,**
Appellant,

v.

Kenneth L. BRUSH, d/b/a Rose City
Nursery, Appellee.

No. 6826.

Court of Civil Appeals of Texas.

Texarkana.

Oct. 13, 1955.

Rehearing Denied Nov. 24, 1955.

266

Brush, doing business as Rose City Nursery, entered into an oral agreement whereby appellant would conduct certain advertising on behalf of appellee's rose nursery business. A portion of the charges made by appellant were paid by appellee. Suit was brought by appellant to recover $9,430.12 which appellant alleged to be the reasonable worth of the services performed but not paid for. Certain jury findings (among others) were made to the effect that the reasonable value of appellant's services (not paid for) was $4,715.06, that the parties had agreed that plaintiff would be paid for its services only out of income and profits from the enterprise, that the 1953 mail order enterprise of defendant resulted in a loss and that there were no profits available from said enterprise to pay plaintiff the balance of his claimed account. The court entered a judgment that plaintiff take nothing, overruled plaintiff's amended motion for new trial, and plaintiff advertising agency has appealed.

By its first point appellant contends that the trial court erred in admitting hearsay evidence from the witness John Stephens, president of a Tyler bank, in regard to a telephone conversation Mr. Stephens had with someone who called him (who apparently showed some knowledge of Brush's negotiations with reference to the advertising matter) and wanted to know about Mr. Brush's financial ability, etc., and wherein Mr. Stephens advised such person that he considered Brush honest, "but if he entered into the contract, the advertising contract would have to pay the indebtedness because we could not advance him any more money because he already owed us." Stephens could not identify the calling party. Brush testified that at this same time he had urged Bloom to call Stephens with respect to this matter and that Bloom advised him (while he was in Dallas conducting his negotiations with Bloom) that Stephens had been contacted. Mrs. Brush, wife of appellee, who was present at the negotiations in Dallas, testified to the effect that she and her husband asked Bloom if he had contacted Stephens, and "he said that he hadn't; that his banker, or somebody, was trying

Warren G. Moore, Smith & Smith, Tyler, for appellant.

Spruiell, Lower, Potter & Lasater, Tyler, for appellee.

FANNING, Justice.

Plaintiff-appellant, Sam Bloom Advertising Agency, and appellee, Kenneth L.

to contact him and we told him we would not go into it until Mr. Stephens was contacted." She was asked if she knew whether Bloom did contact Stephens and she testified:

"A. He told us he did. We came back later in the afternoon and he told us he had talked to the banker.

"Q. You don't know whether it was he himself or which one in his office? A. No, I do not. He just said they had contacted Mr. Stephens."

Bloom denied calling Stephens. He was asked: "Did you have your banker call him?" and answered as follows: "I did not call him. From the best of my memory, best of memory, the only contact was the one that Dick Johnson had, but I could not —I did not personally call him." There is further testimony to the effect that Dick Johnson, an employee of Bloom, later went to Tyler to see Stephens and received from Stephens virtually the identical information that was related in the telephone conversation in question.

In Colbert v. Dallas Joint Stock Land Bank, Tex.Com.App., 136 Tex. 268, 150 S.W.2d 771, 775, it is stated:

"In our opinion the identity of Ferguson was by the facts and circumstances to which Colbert testified sufficiently shown to admit the contents of the conversation. The person called and answering the call stated that he was Hugh Ferguson. In the conversation he revealed a familiarity with the ranch owned by the Land Bank and knowledge of the proposal that Gay had made to Colbert for the sale of the ranch. Colbert, in the telephone conversation, told Ferguson that he had in Carothers a prospective purchaser and that he had shown the ranch to him. Riley, land salesman of the bank, appeared at the ranch with knowledge about Carothers and thereafter sold to Carothers and undivided one-half interest in the ranch. The Land Bank offered no evidence in contradiction of Colbert's testimony as to the conversation with Ferguson. Riley, who was a witness on the trial, did not testify to the source of his information about Carothers. *In view of these facts and circumstances, the sufficiency of the identification was a question of fact for the jury, and the question was decided favorably to plaintiff in error Colbert by the jury's finding that Ferguson, prior to the selling of the ranch, knew of Colbert's efforts to procure a purchaser.*" (Italics ours.)

It is our opinion that the sufficiency of the identification of the person calling Stephens being Bloom, Bloom's banker, or someone from his office representing him, in view of the facts and circumstances outlined above and other circumstances in the record, was a question of fact for the jury, and that question was decided favorably to appellee by virtue of the jury's findings. Appellant's first point is overruled.

Appellant contends by its sixth and seventh points that there was no admissible evidence to support jury finding No. 5 that plaintiff was only to be paid out of the profits of the enterprise and that the evidence was insufficient to support such finding.

Testimony which would probably tend to support the verdict of the jury comes from Brush and his wife, from the circumstances of Brush's financial situation made known to Bloom by Brush at the time of the alleged agreement, and Brush's insistence that Bloom verify this condition from Brush's banker before Brush would enter the agreement, from the testimony of banker Stephens with reference to Brush's financial condition and with reference to the controversial telephone conversation related above. There are also probably other circumstances and inferences from the testimony of Brush, his wife and Dick Johnson, employee of Bloom, who checked up on Brush's financial condition, which would probably tend to support the finding in question to some extent. Bloom vigorously denied any agreement that he was to be paid only out of profits. Brush at one place in the early part of his testimony testified

that he had an agreement with Bloom to the effect that Bloom was to be paid out of the profits. Brush testified that he did no discuss with Bloom that payments for plaintiff's services would be made weekly or every ten days, but that he sent in payments from time to time as the money was accumulating, that Bloom sent his statements each week, that he made payments on the bills as the money came in and "it was understood that as the thing rolled along and money came in, I would keep it going to Mr. Bloom." However, in other portions of his testimony Brush testified as follows:

"Q. Just what did Mr. Bloom tell you at that time? Just what were his words when he told you that he would take his share out of profits? A. Well, I would say he didn't tell me in words.

"Q. He didn't tell you in words? A. No, sir.

"Q. How did he tell you? A. Well, by entering into the agreement that I lay before him; the proposition which was the one and only way that I could do it, and that was done repeatedly.

"Q. Now, you mean you told him —state whether or not you told him that you couldn't employ him unless he could do it on a profit-sharing basis. A. That is what it would amount to. Those are not the words.

"Q. Will you answer that question yes or no?

"The Court: He said that is not the words. State what the conversation was.

"Mr. Moore: I will ask her to please read the question.

"Reporter's Note: Question is read.

"Q. Did you tell him that?

"The Court: By words or otherwise, did you tell him that? A. Well, yes. It would be otherwise. I didn't use the words 'profit-sharing.'

"Q. You didn't use the word profit-sharing? A. That term was not used.

"Q. I will ask you whether or not you told him that he would have to wait until the end of the season to get 'your pay,' determined if 'we' made a profit. Did you tell him that? A. No, sir. I wanted him to start getting that money as fast as it was coming in. * * *

"Q. That was one of their requirements that you send in these payments? A. I am sure they would have hollered pretty quick if they hadn't been getting some money. * * *

"Q. *Did he agree to this advertisement with the understanding he would not get paid for it unless you made enough profit out of these particular advertisements to pay it? A. Well, I don't know just how to answer that.*

"Q. *Well, answer it. A. I didn't ask him the question but I explained my side of it and that's the way I assumed it was meant. He didn't answer me and say definitely if the deal doesn't make it there is no obligation on the part of either of us. I wouldn't expect him to make a statement like that.*

"Q. *As a matter of fact, he didn't make any statement like that, did he? A. No, I said he did not. * * *"* (Italics ours.)

We quote from the testimony of Mrs. Brush as follows:

"Q. *Now, then, did Mr. Bloom make any statement in your presence in the original transaction in Dallas to the effect that if you don't make a profit, you don't owe me any money? A. Didn't anyone make that statement.*

"Q. *There wasn't such statement made? A. No, it wasn't made.* We gave him our proposition and he took it.

"Q. He didn't say, though, that he was going to only expect you to pay it out of the profits?

"The Court: She has already testified that he didn't make that statement."

The testimony further reveals that Brush never denied (to Bloom or to Bloom's attorney) owing the account in question until the suit was filed. We quote from Mr. Brush's testimony as follows:

(Questions being propounded by Mr. Moore, attorney for Bloom.)

"Q. I will ask you if it isn't a fact that you stated to me if we would give you a little time, you believed you could work out of it and pay it? A. I wouldn't say a little time.

"Q. Well, some time. A. I would say sufficient time.

"Q. I will ask you further if it isn't a fact that you, on one or more occasions, at least, one or more, advised Mr. Bloom that you did owe the indebtedness and that you would pay it if given sufficient time? A. Sufficient time, yes sir.

"Q. *I will ask you to state whether or not you, at any time mentioned to Mr. Bloom that this account has been due, that this—he was to be paid only out of the profits?* A. *No.*" (Italics ours.)

Brush denied the account when his deposition was taken after suit had been filed. Mr. Brush's explanation for not denying the account until suit was filed was to the effect that he was in financial straits, with all his property pledged to the bank and his business in such condition that he could not stand a lawsuit, that he would rather have paid the account than to have a lawsuit because he felt sure that a lawsuit would mean bankruptcy for him. Mrs. Brush testified to a similar effect. At another place in his testimony with reference to the account Brush stated: "I will say I didn't admit it and I didn't deny it."

We are inclined to the view that there is some evidence to support jury finding No. 5. Appellant's sixth point is overruled.

However, in view of the recitals above quoted from the testimony of appellee Brush and his wife, and after carefully considering the matter it is our best judgment that the evidence in this case is insufficient to support jury finding No. 5. Appellant's seventh point is sustained.

Appellant contends by its second point that the trial court erred in admitting in evidence the audit statement of the witness Don Cowan and in permitting him to testify thereto, over appellant's objections.

Don Cowan was called as a witness by appellee Brush. The manner in which the audit report was admitted in evidence, and the objections made thereto, are revealed by the record as follows:

"Q. You are Don Cowan? A. Yes, sir.

"Q. Are you an accountant? A. I am.

"Q. You work for various and different people in Tyler and this area? A. Yes, sir.

"Q. Is one of your clients Mr. Kenneth Brush? A. Yes, sir.

"Q. How long have you kept his records? A. Since about May of '52.

"Q. Have you made up any record showing the result of his 1953 mail-order rose business? A. Yes, sir.

"Will you hand me that, please sir?

"Reporter's Note: Witness takes from brief case an instrument which is marked for identification 'D-2' M

"Q. Was this statement you have handed me made up from the books and records of Mr. Brush that were kept—that you have examined from time to time? A. Yes, sir.

"Mr. Potter: We offer this. Would like to offer this statement in evidence.

"Mr. Moore: Object to the statement until I have seen the number of items and what it is based upon. I want to see it before it is admitted, Your Honor.

"Mr. Potter: Your Honor, that would be matter of cross examination. I am sure he has the details on whatever data he may want to go into.

"The Court: Overrule.

"Mr. Moore: Your Honor, I further object to the admission of that statement in evidence because of the fact that it has not been substantiated by the proper documents; for the reason that it does not, the proper predicate has not been laid for its admission here.

"The Court: Overrule.

"Mr. Moore: Note my exceptions.

"Q. Mr. Cowan, is this statement, marked Defendant's Exhibit 2, is that a correct statement of income and expenses for the retail mail-order operations from January 1, '53 to June 30, '53? A. That is a correct representation with this qualification: that a number of the items on the statement are expenses which were not kept separate in the general books and accounts by departments. They were kept only for the over-all operations. The books themselves are maintained for income tax purposes, and are maintained, therefore, on the entire operations, only. Now, when it came down to dividing between this operation and a couple of others, it was necessary to make certain allocations."

The exhibit in question purports to show an income of $77,773.32, expenses of $78,249.10, and a loss of $475.78.

Appellant in its reply brief states: "The jury during its deliberation, called for the exhibit in question, namely Cowan's report." Appellee filed later a supplemental brief which does not question the above statement made by appellant.

Mr. Brush testified that Mr. Don Cowan had "kept his books" and referred to him as "his auditor" and also referred to him as an accountant. Mr. Cowan testified as above that he had "kept Mr. Brush's records" since May, 1952. He also answered "Yes" to the question above quoted with reference to the exhibit in question, as follows: "Was this statement you have handed me made up from the books and records of Mr. Brush that were kept—that *you have examined from time to time?*" And Mr. Cowan (as shown by his testimony hereinbefore quoted) testified that the statement (audit exhibit) was a correct statement of income and expenses for the retail mail-order operations from January 1, "53" to June 30 "53", with a qualification hereinbefore quoted in his testimony. He did not thus testify that the original books of accounts themselves were correctly kept. We have carefully searched the entire record and we have been unable to find any testimony from any source that the original books of accounts of Brush were correctly kept.

We quote further from Mr. Cowan's testimony as follows:

"Q. How do you know that that was the funds which came—all of the funds which came from the mail-order account? A. I have no way of knowing.

"Q. Is it your testimony that none of the money from this particular enterprise went into those sheds? A. Now, you are getting me off on a subject I don't know anything about. The books of account—

"Q. That is all right. You just don't know, then, do you? A. That is true.

"Q. It could have and you not know it? A. Yes, sir, very well."

In McCormick & Ray, Texas Law of Evidence, Sec. 557, p. 709, it is:

stated: "It is obvious that account-books and entries therein are not admissible in the absence of some showing by preliminary evidence as to what the proffered books and entries are and under what circumstances they have been kept. *The books do not 'prove themselves.'*" (Italics ours.) The necessary legal predicate for the introduction in evidence of books of account is stated by the Supreme Court of Texas in Stark v. Burkitt, 103 Tex. 437, 129 S.W. 343, 344, as follows:

"To authorize the introduction of book accounts in evidence, it must be proved: (1) That the book or books contain original entries of transactions pertinent to the business in question. (2) It must appear that the entries were made in the regular course of business at or near to the time the transactions were had. (3) That the entries must be such as to indicate what the charge is for; that is, what the transaction was. (4) That the entries were made by one who was authorized to do so, and that he did the act so recorded himself, or that he made the record upon information derived from one who was authorized to do so. (5) That the transactions were regularly entered, and that the books were correctly kept. 17 Cyc. p. 371 et seq.; Taylor v. Coleman, 20 Tex. [772] 778; Ward v. Wheeler, 18 Tex. [249] 264; Burnham v. Chandler, 15 Tex. [441] 444; Bupp & Robbins v. O'Connor, 1 Tex.Civ.App. 328, 21 S.W. 619. The evidence did not comply with these requirements."

 Appellee contends that the audit statement was admissible because appellant failed to object to it on the ground that it was secondary evidence and not the best evidence and also contends that it was inferable from the record that the books and accounts were voluminous, and that under the exception and rule stated in the case of Shelby County v. O'Banion, Tex.Civ.App., 188 S.W.2d 195, and other cases cited by appellee, the audit and testimony of the auditor was admissible. The rule with respect to summaries and tabulations is tersely stated in 17 Tex.Jur., Sec. 202, pp. 509–510, in part, as follows:

"Where books of account or accounts are voluminous, involving intrinsic details, and it is inconvenient to make the necessary examination, an expert accountant or other competent person who has examined them may be permitted to state his conclusions as to what they show, or *tabulated statements made up from books in evidence may be admitted where they are shown to be correct and to contain all that which the books would show in regard to the matter involved.*" (Italics ours.)

In 17 Tex.Jur., Sec. 201, pp. 507–508, it is stated:

"If books which are admissible cannot be produced, their contents may be shown by secondary evidence, as by testimony of the person who kept them, or by copies of them properly proven, *provided it is shown, with all reasonable certainty that the books were so kept as to render them admissible upon being produced.*" (Italics ours.)

The audit report in question was clearly secondary evidence. The original books of accounts were not introduced in evidence and no reason was given for their non-production. There was no direct testimony that they were voluminous; however, appellee argues that this might be reasonably inferred from the length of plaintiff-appellant's account shown in the record. However, appellant objected to the introduction of the audit report because the proper predicate for its introduction had not been laid. It is just as necessary in introducing secondary evidence (whenever secondary evidence may become admissible) of the contents of books of account that the same predicate be laid as would have been required had the books themselves been offered. In Caldwell v. McGarvey, Tex.Civ. App., 285 S.W. 859, 861, error dismissed, it is stated:

"Complaint is further made that testimony as to the contents of the books

of the Citizens' National Bank of .Longview were received in evidence without a predicate that the entries in said books were made in due course of business and that the books were correctly kept. The books were beyond the jurisdiction of the court, and secondary evidence as to the contents of said books was therefore admissible; but, if the books had been brought into court, the entries therein could not have been introduced without the necessary predicate. The requirements of such a predicate are concisely stated by the Supreme Court in the case of Stark v. Burkitt, 103 Tex. 437, 129 S.W. 343. *It is believed that the same predicate for the introduction of secondary evidence as to the contents of said books is required as would have been requisite had the books been offered."* (Italics ours.)

We have carefully searched the entire record and find no testimony that such original books of account were correctly kept. In fact, the qualifying evidence with respect to the books of accounts of Brush is rather meager and we have reached the further conclusion that the evidence in this case does not sufficiently show that the other requirements stated in Stark v. Burkitt, supra, were made in order to make admissible in evidence either the books of accounts themselves (which were not offered) or the secondary evidence audit statement in question, over the objection of appellant to the effect that the proper predicate had not been laid for the introduction of such audit report. Appellant's second point is sustained. We are of the further opinion that the error in question constitutes reversible error for the reasons hereinafter stated.

Appellee contends that the audit statement in question was not the only evidence showing a loss; that there was the direct testimony of Brush and Cowan (unobjected to) when they had a discussion with Bloom in July 1953, wherein Bloom admitted that they told him there was a loss and appellee contends that this evidence is cumulative evidence sufficient to support the jury's an-

swers to issues 3 and 6 (issues with reference to whether a profit or loss was sustained) even in the absence of the audit exhibit in question and that therefore reversible error was not shown by the introduction in evidence of the audit report. Appellee also contends that appellant waived its objection to the audit report by his cross-examination of Cowan and further examination of Brush and Cowan concerning same.

In Bush v. Davis, Tex.Civ.App., 147 S.W. 2d 888, 890, error dismissed, where a secondary evidence audit report involving voluminous transactions were admitted in evidence, and where the cause was reversed because of the objectionable nature of the contents of the audit report, the court stated:

"Furthermore, the court permitted the jury to take into the jury room and retain during its consideration, the auditor's report containing, as it did, the series of opinions, conclusions, deductions, arguments and hearsay statements on controverted issues. *Clearly, the admission of the report was calculated to influence the jury and impress it with the importance of the document."* (Italics ours.)

Probably the unobjected to statement of appellee to the effect that he had a loss and had made no profits out of the enterprise (although he undoubtedly used his access to his books to determine this inasmuch as the claimed loss was small and the transactions were many) was barely sufficient to support jury findings 3 and 6. The testimony to the same effect of the witness Cowan, however, under this record is undoubtedly based on Cowan's examination or interpretation of the books of account as his other testimony indicates his lack of actual knowledge of the transactions other than from the books and accounts of Brush.

The audit account exhibit in question was permitted in evidence, the jury heard this testimony, the exhibit was an instrument authorized to be given to the jury, and an unchallenged statement in appellant's reply brief states that the jury called for the exhibit.

Clearly, the audit exhibit greatly bolsters the testimony of appellee to the effect that he had sustained a loss and did not make a profit in the enterprise. Clearly the admission of the audit report exhibit was calculated to influence the jury and impress it with the importance of the exhibit.

We have carefully examined the record and have reached the conclusion that appellant did not waive its objection to the audit report exhibit by the cross-examination and examinations referred to by appellee. See the following authorities: Cathey v. Missouri K. & T. Ry. Co. of Tex., 104 Tex. 39, 133 S.W. 417, 33 L.R.A.,N.S., 103; Dallas Ry. & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379; Tex. Employers Ins. Ass'n v. Dillingham, Tex.Civ.App., 262 S.W.2d 748, wr. ref., n. r. e.; Tex. Emp. Ins. Ass'n v. Shiflet, Tex.Civ.App., 276 S.W.2d 942, er. ref. n. r. e.

Whether the erroneous admission in evidence of the audit report exhibit in question was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case is a question which we must determine as a matter of our judgment in the light of the record as a whole. Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115; Rules 434 and 503, Texas Rules of Civil Procedure.

Considering the record as a whole, considering the undoubted weight given by the jury to the audit report in question in passing on issues Nos. 3 and 6, it is our best judgment that the admission in evidence of the audit report in question over appellant's objections was in law reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case.

Appellant's other points have been carefully considered and are respectfully overruled.

The judgment of the trial court is reversed and the cause is remanded to the district court for a new trial.

Reversed and remanded.