The SHERWIN–WILLIAMS COM-
PANY, Appellant,

v.

The PERRY COMPANY, Appellee.

No. 11564.

Court of Civil Appeals of Texas.

Austin.

Feb. 21, 1968.

Rehearing Denied March 13, 1968.

Coleman Gay, Joseph Latting, Austin, for appellant.

Small, Herring, Craig, Werkenthin & Shannon, Charles F. Herring and Fred B. Werkenthin; Brown, Erwin, Maroney & Barber, Jack D. Maroney and Will G. Barber, Austin, for appellee.

PHILLIPS, Chief Justice.

The Perry Company, Appellee here, is in the manufacturing business wherein it makes diving boards, plastic furniture, water skis, shopwork and millwork. It also has income from investments that have been placed within its corporate structure. Its principal field, however, is the manufacture of diving boards which constitutes 65% of its entire business and it is the second largest diving board manufacturer in the United States.

The Appellant here is the Sherwin-Williams Company which furnished Appellee paint for its diving boards and, allegedly, some bad advice in the use thereof. The suit was for damages for loss caused from defective diving boards and the resulting loss of goodwill. Based upon jury answers to special issues, the court entered judgment against Appellant for $183,607.27.

We reverse the judgment of the trial court and remand the cause for trial consistent with this opinion.

A summary of Appellee's case is as follows: In 1964 it produced 9,538 diving boards. In finishing these boards, Appellee used a polyester coating with sand sprinkled in the second coat on the topside for a non-slip tread. 382 of these boards

were returned under customer warranties for various defects mostly relating to finish failures resulting in a 4.01% return rate. That with its production procedure standardized, if Appellee had used the polyester finish again for its 1965 diving boards, approximately a 4% return rate could have been expected.

Hoping to reduce the 4% return rate, Appellee informed Appellant's salesman of its desire to find a better finish for diving board purposes than polyester. In November of 1963, the salesman sought a recommendation from Appellant's laboratory with respect thereto. Two months later the laboratory recommended to the salesman that Appellant's diving boards be finished with a pre-paint application of a product called Homoclad and two coats of Appellant's Super Kem Var M paint. This latter product originated as a furniture finish, which had little, if any, exterior use. This laboratory report (which was never shown to Appellee) and which makes no reference to application of plaintiff's customary sand tread states, "The system is looking very good, however, we certainly

are not ready to make any claims for the exterior durability of this system."

Despite this caution and with full authority allegedly admitted by Appellant to act for it, the salesman went to Appellee's plant three days later and recommended M paint with Homoclad as a better diving board finish than polyester. When the salesman applied text-applied M paint, there was a "bubbling effect" that left "pinholes" upon drying, which were readily apparent to the eye.

The cause of the difficulty with the diving boards was that moisture permeated the wood.

Following further laboratory work on this solvent problem, the salesman returned to Appellee in September of 1964, and, knowing that Appellee intended to use a competitor's pre-paint application called Woodyouth instead of Homoclad, stated in substance to Appellee that M paint applied as directed by him would be suitable for finishing its 1965 diving boards and would do a better job than polyester.

In answer to express warranty special issues,[1] the jury confirmed the foregoing,

1. "SPECIAL ISSUE NO. 1: Do you find from a preponderance of the evidence that in September of 1964 The Perry Company agreed with L. W. Smith to buy and use Super Kem Var M paint to finish its 1965 diving boards?

    Answer this issue 'Yes' or 'No.'

    Answer: <u>Yes</u>

SPECIAL ISSUE NO. 2: Do you find from a preponderance of the evidence that in September, 1964, L. W. Smith knew that The Perry Company intended to use Woodyouth and not Homoclad with Super Kem Var M paint in finishing its 1965 diving boards?

    Answer 'Yes' or 'No.'

    Answer: <u>Yes</u>

If you have answered the foregoing issue 'Yes' and only in such event answer the following special issue.

SPECIAL ISSUE NO. 3: Do you find from a preponderance of the evidence that in September, 1964, L. W. Smith knowing that The Perry Company intended to use Woodyouth and not Homoclad, if you have so found, warranted to The Perry Company that Super Kem Var M applied

as directed by him would be suitable for finishing its 1965 diving boards?

    Answer 'Yes' or 'No.'

    Answer: <u>Yes</u>

In connection with the foregoing special issue you are instructed that a warranty is any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain.

If you have answered the foregoing issue 'Yes' and only in such event answer the following special issue.

SPECIAL ISSUE NO. 4: Do you find from a preponderance of the evidence that such warranty, if any, by L. W. Smith was relied upon by The Perry Company until June of 1965 in buying and using Super Kem Var M paint in finishing its diving boards?

    Answer 'Yes' or 'No.'

    Answer: <u>Yes</u>

If you have answered the foregoing issue 'Yes' and only in such event answer the following special issue.

SPECIAL ISSUE NO. 5: Do you find from a preponderance of the evidence

finding that in September of 1964, Appellee agreed with the salesman to buy and use M paint to finish its 1965 diving boards; that in September of 1964, the salesman knew Appellee intended to use a competitor's Woodyouth and not Appellant's Homoclad with M paint in finishing its 1965 diving boards; that with such knowledge the salesman warranted to Appellee that M paint, applied as directed by him, would be suitable for such purpose, and that use thereof was a proximate cause of damage to Appellee.

In the course of obtaining Appellee's agreement in September of 1964 to buy and use M paint to finish its 1965 diving boards, the salesman undertook at the time to inform Appellee how M paint should be applied to its diving boards. That he did inform Appellee with respect thereto is uncontroverted in the evidence, but *what* he informed them with respect thereto is sharply disputed.

Appellant contends that this suit began as a conventional product liability suit charging Super Kem Var M as being defective, however, that this charge was withdrawn, the evidence regarding any defect in the paint being so slight that no special issue was given or requested.

Appellant further contends that being wholly unable to establish any defect in the paint itself, Appellee then charged that the reason the finish failed was that the manner in which the paint was applied with Woodyouth and Cabosil, or the use of the paint with those materials, was the cause of the defective finish. That since Appellant did not recommend the use of Woodyouth or Cabosil, the effect of the charge was that Appellant should have warned Appellee against using the combination, although it was charged, and the jury found, that the Appellant's salesman had been negligent in showing Appellee's employees how to apply the three materials to the diving boards. With respect to the negligence issues[2] Appellant contends that

that the reliance by The Perry Company on such warranty, if any you have found, was reasonable under the circumstances?

Answer 'Yes' or 'No.'
Answer: Yes

If you have answered the foregoing issue 'Yes' and only in such event answer the following special issue.

SPECIAL ISSUE NO. 6: Do you find from a preponderance of the evidence that Super Kem Var M applied as directed by L. W. Smith was not suitable for finishing the 1965 diving boards of The Perry Company?

Answer this issue 'It was not suitable' or 'It was suitable.'

Answer: 'It was not suitable.'

If you have answered the foregoing issue 'It was not suitable' then and only in such event answer the following special issue.

SPECIAL ISSUE NO. 7: Do you find from a preponderance of the evidence that The Perry Company's use of Super Ken Var M paint from November of 1964 until June of 1965 applied as directed by L. W. Smith was a proximate cause of the damage, if any, to The Perry Company?

Answer 'Yes' or 'No.'
Answer: Yes"

2. "SPECIAL ISSUE NO. 12: Do you find from a preponderance of the evidence that, in informing The Perry Company before November 23, 1964, how Super Kem Var M paint should be applied to its 1965 diving boards, L. W. Smith failed to direct such company to apply two coats of Super Kem Var M paint under and in addition to the sand tread?

Answer this issue 'Yes' or 'No.'
Answer: Yes

If you have answered the last preceding special issue 'Yes,' then, and in that event only, you will answer the following

SPECIAL ISSUE NO. 13: Do you find from a preponderance of the evidence that such failure, if any, was negligence?

Answer this issue 'Yes' or 'No.'
Answer: Yes

If you have answered the last preceding special issue 'Yes,' then, and in that event only, you will answer the following

SPECIAL ISSUE NO. 14: Do you find from a preponderance of the evidence that such negligence, if any, was a proxi-

it was not shown that the salesman had any duty to give such directions to Appellee, or that he did give any such directions.

Furthermore, Mr. Maurice W. Cole, the president of Appellee Company was an acknowledged expert in the use of wood, and by his own admission was a pioneer in certain phases of the painting of wood.

Appellant's salesman, on the other hand, had never painted or assisted in painting a diving board. It was admitted that after a considerable amount of laboratory testing, Appellant recommended a sealer coat of Homoclad and two coats of Super Kem Var M, and that the salesman passed this recommendation to Mr. Cole. Appellant further contends that, admittedly, the salesman did not recommend Woodyouth or Cabosil, both of which were then being used by Appellee.

That Mr. Cole admitted test quantities of Homoclad and Super Kem Var M were sent to Appellee, that one test that could easily have been made was to paint a board or panel in accordance with the laboratory recommendation, put it outside in the sun, that there is no laboratory test as good as a field test. That Mr. Cole further testified that in determining whether or not a particular finish will keep out moisture, "experience is the only answer."

Appellant further contends that no contract was made or claimed whereby Appellee was forced to buy and Appellant was forced to sell the paint in question. That, on the contrary, each purchase was a separate transaction, and upon receipt of each order Appellant sent Appellee an acknowledgment upon which was prominently displayed a disclaimer of warranty.

mate cause of damage to The Perry Company?

Answer this issue 'Yes' or 'No.'
Answer: Yes

SPECIAL ISSUE NO. 15: Do you find from a preponderance of the evidence that, in informing The Perry Company before November 23, 1964, how Super Kem Var M paint should be applied to its 1965 diving boards, L. W. Smith directed such company to add cabosil to Super Kem Var M paint applied to the sand tread area?

Answer this issue 'Yes' or 'No.'
Answer: Yes

If you have answered the last preceding special issue 'Yes,' then, and in that event only, you will answer the following

SPECIAL ISSUE NO. 16: Do you find from a preponderance of the evidence that such direction, if any, was negligence?

Answer this issue 'Yes' or 'No.'
Answer: Yes

If you have answered the last preceding special issue 'Yes,' then, and in that event only, you will answer the following

SPECIAL ISSUE NO. 17: Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of damage to The Perry Company?

Answer this issue 'Yes' or 'No.'
Answer: Yes

SPECIAL ISSUE NO. 18: Do you find from a preponderance of the evidence that, in informing The Perry Company before November 23, 1964, how Super Kem Var M paint should be applied to its 1965 diving boards, L. W. Smith failed to direct such company to apply one coat of Super Kem Var M paint over the sand tread?

Answer this issue 'Yes' or 'No.'
Answer: Yes

If you have answered the last preceding special issue 'Yes,' then, and in that event only, you will answer the following

SPECIAL ISSUE NO. 19: Do you find from a preponderance of the evidence that such failure, if any, was negligence?

Answer this issue 'Yes' or 'No.'
Answer: No

If you have answered the last preceding special issue 'Yes,' then, and in that event only, you will answer the following

SPECIAL ISSUE NO. 20: Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of damage to The Perry Company?

Answer this issue 'Yes' or 'No.'
Answer: ————.' "

That Appellee used Super Kem Var M in combination with Woodyouth and Cabosil from November 1964 to June 1965 and it had a large number of diving boards or tags from boards returned during that period. That despite the fact the most that could be said for Appellee's testimony was that the salesman knew that Cabosil and Woodyouth were to be used with Super Kem Var M, and in fact showed its employees how to apply it, the jury found that Appellant expressly warranted that Super Kem Var M "applied as directed" by the salesman was suitable for finishing the diving boards.

The jury also found Appellant liable on the theory of implied warranty on the theory that the salesman was negligent in the instructions he gave for finishing the diving boards.

As stated above, the total damages found by the jury was $183,607.27 of which $75,000 was for the loss of goodwill and $15,000 was for the loss of projected earnings for 1966.

## I.

Appellant is before this Court on twenty-nine points of error, the first two of which, briefed together, are the error of the trial court in permitting Appellee's employee to testify from his examination of its books and records to the number of diving boards returned by its customers in 1964 and 1965 over defendant's objection that the books would be the best evidence and there being no showing that the books and records were kept in such manner as to make them admissible in evidence if they had been offered; the error of the court in permitting Appellee's accountant to testify from his examination of its books and records as to the cost of manufacturing the diving boards, over Appellant's objection that the books were the best evidence and there being no showing that they were kept in such manner as to make them admissible in evidence if they had been offered.

Mr. Frank Petty, Appellee's manager of sales and traffic, testified that he had been employed by Appellee since October 4, 1965; that at the request of Appellee's counsel he had "calculated various statistics from The Perry Company's business records" to the best of his ability to do so and that he had brought with him "notes reflecting such figures."

He was then asked to state the number of diving boards returned by purchasers for the fiscal year 1964, "as reflected by the company records," to which Appellant objected on the ground that the books would be the best evidence. The objection having been overruled, the witness testified that his examination showed that 382 boards out of a total of 9,538 boards produced in 1964 were returned, or 4.01% of the production.

The court then agreed that Appellant's original objection should extend to the entire line of testimony.

Mr. Petty further testified that according to the books and records that he examined, 7,704 boards were finished during 1965 in the manner allegedly directed by Appellant's salesman and that 2,441 of them were returned. He then testified to the total production and percentage for returns for boards finished in various ways, all of which testimony was intended to show that the rate of return was much greater during the period when they were finished as allegedly directed by the salesman. This entire testimony was a recital of what he had found in the books.

The head of Appellee's accounting firm, Mr. Ben Barr, testified that he had checked the books in order to determine the cost of the returned boards to which $8.66 was added for administrative overhead, making an original cost of $41.92 each. He calculated that the cost of handling each return to be $1.37. All figures given by Barr were obtained from books and records which were not produced in court and which were not shown to have been kept in such manner as to be admissible in evidence. Stark v. Burkitt, 103 Tex. 437, 129 S.W.

343 (1910); 2 McCormick & Ray, Texas Law of Evidence 402, Sec. 1563; J. E. Earnest and Company v. Word, 137 Tex. 16, 152 S.W.2d 325 (1941); Dallas Railway and Terminal Co. v. Guthrie, 146 Tex. 585, 210 S.W.2d 550 (1948).

Appellant here points out that neither Petty nor Barr had any business connection with Appellee when most of the entries were made and, at most, could have known how they were kept only by hearsay.

Appellee contends that the court's ruling was proper under the voluminous records exception to the best evidence rule. This exception is stated in 23 Tex.Jur.2d, Evidence, Sec. 236, page 359, as follows: "If books of accounts are so voluminous and detailed as to make their examination in court inconvenient, an expert accountant or some other competent individual, who has examined them, may properly be permitted to testify as to their contents. * * * The admission of such testimony is within the discretion of the trial court. * * *" 2 McCormick & Ray, Evidence 413 (Sec. 1566) states: "* * * If the books or other records are produced or tendered, but are complicated or voluminous, an expert who has examined them may testify as to his calculations, summaries or conclusions to aid the court or jury to understand them."

■ These two statements from the authorities are correct; however, to state them begs the question before us. We hold that in order to stand on this exception to the best evidence rule, a proper predicate or showing must be had as to how these books were kept, Stark v. Burkitt, supra. Having done so, it is entirely possible that the abovementioned exception could have been relied upon.

The rule is stated in 29 Am.Jur.2d, Evidence, Sec. 458, page 517: "It is a general rule of evidence, sometimes declared by statute, that it is permissible for a witness to give a summary based on an inspection of a number of documents where the docu-ments are so numerous and intricate as to make an examination of them in court impractical, *provided, of course that the documents themselves are competent as evidence,* and that they are made accessible to the opposing party in order that the correctness of the summary may be tested on cross examination * * * The trial court has ·broad discretion in admitting or rejecting such a summary and in imposing conditions under which it may be admitted." (Emphasis added.)

Texas follows this rule. Sam Bloom Advertising Agency v. Brush, 284 S.W.2d 265 (Tex.Civ.App. Texarkana 1955, no writ); Stinnett v. Paramount-Famous Lasky Corporation, 37 S.W.2d 145 (Tex.Com. App.1931).

■ If the books and records of Appellee had been produced in court and offered in evidence they would have been hearsay to Appellant; however, upon proper predicate they may have been admissible. The testimony of Petty and Barr as to the contents of the books without this predicate was double hearsay.

In this era of big business, voluminous records may well become the rule rather than the exception. It is difficult for us to believe that where these records are an integral part of the moving parties' case, that merely by making a welter of records accessible to an opposing party, at the discretion of the trial judge, the burden is shifted to the opposing party, making it his duty to cull out any barriers to admissibility that may be inherent therein. These records are hearsay and any testimony rooted therein is hearsay spawned in hearsay.

We sustain these points only to the extent of the rule announced above. Inasmuch as we sustain certain of Appellant's points, hereinafter described, and in view of another trial, it becomes unnecessary to pass upon Appellee's reply points to the effect that Appellant's objection to the admission of the evidence described above was inadequate, and also the reply point

that subsequent evidence, admitted without objection, proved the matters that were attempted to be proved by the evidence in question.

Appellant's third point of error is that of the trial court in refusing to permit it to show on cross examination of Appellee's accountant that Appellee's income tax returns for 1964, 1965 and 1966 showed losses from its manufacturing operations of $142,000, $85,000 and $18,000, respectively.

We sustain this point.

According to testimony [3] of Appellee's head accountant Barr, the profit from its manufacturing business for 1963 was approximately $21,000, for the fiscal year 1964 was approximately $3,000 and for the fiscal year 1965 was approximately $12,000. According to the income tax returns, however, its losses for 1964, 1965 and 1966 were, respectively, $142,000, $85,000 and $18,000.

As stated above, Appellee manufactured not only diving boards but also plastic furniture, water skis, surfboards, millwork and shopwork. The testimony discloses that for the year 1965 its $735,000.00 net sales income in 1965 was derived $480,000 from diving boards, $57,000 from plastic furniture, $7,000 from water skis, $80,000 from shopwork, and $122,000 from millwork. Thus it can be seen that approximately 65% of the manufacturing operations consisted of diving boards.

Appellee objected to the admission of these income tax returns on the basis that they were immaterial and irrelevant, that they would be prejudicial to Appellee, that the figures for diving board operations were so intermingled with all other figures they could not be "untangled and analyzed in any meaningful way" and, that its probative value was so slight that "the court * * * should exercise its discretion by

reason of the prejudicial aspects of this testimony to exclude it."

It is difficult for us to understand how under modern accounting procedures, where the diving boards accounted for roughly 65% of Appellee's business, that the returns in question should have been excluded. Certainly had the profits from the diving board business, which accounted for $480,000.00 of $735,000.00 total manufacturing operations in 1965, been wiped out from losses from the manufacture of plastic furniture, skis, shopwork and millwork, that losses from approximately ⅓ of the manufacturing operations had wiped out profits from ⅔ of the manufacturing operations; the fact could have been shown, thus nullifying any probative value of the returns.

■ The rule is stated in 20 Am.Jur.2d 309, Sec. 260, to the effect that relevant evidence will not be excluded on the ground that it would create unfair prejudice if permitted, at least where such evidence is not merely circumstantial.

■ We hold that the evidence was highly relevant for the purposes of impeachment, that the prejudicial effect would be no greater than the prejudicial effect any relevant figures offered in rebuttal, and that it is only reasonable to assume that should the losses stated in the returns have no bearing on the diving board business, then this fact could have been shown by Appellee through competent testimony.

The case of Bunten v. Davis, 82 N.H. 304, 133 A. 16, 45 A.L.R. 1409 (1926), contains an excellent discussion of the subject. It was there held that certain testimony was admissible, although it related to the conduct of other persons besides the defendant, and was comparatively remote. The Court said in part as follows:

"The ruling was also put upon the ground that the proffered evidence would

---

3. The books and records from which he drew such conclusions are the same books and records which are discussed under Appellant's points one and two, supra.

create unfair prejudice in favor of the defendant. It is well settled in this state that the issue presented by the invocation of the undue prejudice rule is one of fact. Citing authorities. But this statement of the rule is not to be taken to mean that exclusion upon this ground can be applied to all offers of proof. The issue raised is one of fact; but the determination of when it may be raised is matter of law. * * * The exclusion of relevant evidence upon the ground that it would create unfair prejudice is permitted when the evidence is merely circumstantial. * * *

But the rule does not extend so far as to permit the exclusion of facts which the law declares to be elements of the situation which are to be considered. It has no application to direct evidence. The question whether certain facts constitute a cause of action or afford a ground of defense is one of substantive law; and, if it be resolved in the affirmative, the evidence thereof becomes admissible." (133 A. 20, 45 A.L.R. 1416).

These returns are certainly direct evidence as to losses from Appellee's manufacturing business and are admissible as rebuttal evidence or as admissions against interest.

## II.

■ Appellant's fourth point of error (which is also pertinent to Appellee's twenty-first through twenty-ninth points) is that of the court in submitting Special Issue No. 12, over its objection that it was on the weight of the evidence, in assuming that L. W. Smith would direct the application of the finish to the diving boards.

We sustain this point, and in addition sustain the twenty-first through twenty-ninth points.

The trial court submitted Special Issue No. 12 to the jury in the following language:

"Do you find * * * that, in informing The Perry Company before November 23, 1964, how Super Kem Var M paint should be applied to its 1965 diving boards, L. W. Smith failed to direct such company to apply two coats of Super Kem Var M paint under and in addition to the sand tread?"

To the submission of the issue Appellant made the following objection, among others:

"14. Defendant objects and excepts to Special Issue No. 12 because it is on the weight of the evidence in that it informs the jury almost in so many words that L. W. Smith informed The Perry Company how Super Kem Var M paint should be applied. * * *

If there were any pleading to support such issue it is Defendant's view that there should be an issue as to whether or not the defendant's agent, L. W. Smith, undertook to instruct Plaintiff how to apply Super Kem Var M to its 1965 diving boards. * * *"

This issue should have been divided into two separate issues inquiring (a) whether or not L. W. Smith directed or instructed the manner in which Super Kem Var M was applied (b) if so, whether or not L. W. Smith failed to direct that two coats of Super Kem Var M be applied in addition to the sand tread. Tex.R.Civ.P. 272. Hodges, Special Issue Submission in Texas, Sec. 7, p. 19.

Appellant's fifth point of error is that of the court in overruling Appellant's motion for judgment non obstante veredicto.

Appellant contends that when it received an order from a customer (including Appellee), it mailed an acknowledgment of the order to the customer. The acknowledgment contained not only a statement of the goods ordered by the customer, but also the following disclaimer:

"This acceptance of the order for the herein described materials is upon the

condition that there are no representations or warranties expressed or implied by or on behalf of the seller beyond the seller's general warranty that when delivered by the seller the materials are of merchantable quality and since use thereof involves many variables in methods of application, handling and/or use the user in accepting and using these materials assumes all responsibility for the end result. Claims for unmerchantable quality must be reported immediately and use of alleged faulty material discontinued, and in any event seller's liability shall not exceed purchase price."

That a copy of the form of acknowledgment so used was admitted in evidence and it has been sent to this Court in original form. That an examination of the acknowledgment will disclose that the above quoted language is prominently shown on the front of the form in large, easy-to-read type, and that any attempt to dismiss the disclaimer as being in "fine print" must be unsuccessful. That it was shown that such an acknowledgment was sent to every industrial customer following receipt of an order.

That it was further shown that on December 5, 1964, a request for a data sheet was received at Appellant's Garland office, which instrument was admitted in evidence. Appellant's witness, Mr. J. H. Nelson, testified that although the file contained no cover letter showing that the data sheet was sent, he felt sure that it was sent to Appellee's president, Mr. Cole, in accordance with the request therefor. The data sheet contained the following disclaimer:

"Note: The information, ratings and opinions stated above pertain to material currently offered and represent results of laboratory evaluations. Since the customer's application and other requirements are not known or are not under our control, the company cannot make any warranties or guarantees as to results."

That a test shipment of Super Kem Var M was made to Appellee on October 5, 1964,

and thereafter shipments were made on October 24, November 16, December 15 and December 17 (2 shipments) of the year 1964, and on January 17 and January 25, 1965. That in accordance with its uniform custom, Appellant sent an acknowledgment in the form of its Exhibit No. 4 upon receipt of each order. Appellee did not admit having noticed the disclaimer on the acknowledgments.

■■ We overrule this point inasmuch as disclaimer is an affirmative defense and must be plead under Tex.R.Civ.P. 94. However, in view of another trial unless there is a legal difference between paint and watermelon seeds, we believe the parties have a right to make any contract they desire with reference to each commodity not violative of law or public policy. No such violation is claimed here.

As to watermelon seeds, this Court held in Hall v. Mosteller, 245 S.W.2d 338, writ ref. n. r. e., that no liability existed when purchased seeds "Guaranteed to be Black Diamond" melon seeds produced, when planted, pie and citrus melons because the purchase order provided that the seller would not be responsible for the crop. Our decision was based primarily upon the opinion in Pyle v. Eastern Seed Co., 145 Tex. 385, 198 S.W.2d 562, from which we quote:

"Pyle contends that the failure of the seller to furnish him the variety of onion seed contracted to be delivered is a breach of the contract, and such breach sustains the judgment of the trial court. This contention is sound enough if the contract did not contain what is generally designated as a nonwarranty clause. The buyer and the seller were free to make whatever contract they desired, so long as its provisions were not illegal or immoral. They agreed that the seller gave no warranty, express or implied, as to description, purity or productivity, and would not be in any manner responsible for the crop. In other words, the buyer agreed to this provision of the contract

and bought the seed knowing that the seller was protecting itself under the nonwarranty provision. It is firmly established that where parties have signed, and thereby entered into a written contract, they are bound by its provisions."

█ The point is made here that to honor the disclaimer of Appellant from all responsibility for the "end result" of purchasers using its paint is to protect it against its own negligence. The rule to be followed in determing this point is stated in Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631, Tex.Sup., as follows:

"In Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775, this Court discussed the rule that an indemnity agreement will not protect the indemnitee against the consequence of his own negligence unless the obligation is expressed in unequivocal terms. The obvious purpose of this rule is to prevent injustice. A contracting party should be upon fair notice that under his agreement and through no fault of his own, a large and ruinous award of damages may be assessed against him solely by reason of negligence attributable to the opposite contracting party. See, Perry v. Payne, 217 Pa. 252, 66 A. 553, [11 L.R.A.,N.S., 1173.] Texas does not, however, follow the refinement of the rule which requires that the agreement, in order to effectually embrace the negligence of the indemnitee, should expressly so state. It was stated in Friedman that, 'It is not necessary * * * for the parties to say in so many words that they intend to protect the indemnitee against liability for negligence.' The rule is that when the wording of the contract is sufficiently broad to cover the negligence of the indemnitee and the situation of the parties with reference to the subject matter of the contract is such that it can clearly be said that the parties intended that the negligence of the indemnitee should be covered by the indemnity agreement,

then liability thereunder will be sustained whenever the injury asserted as a basis for indemnity is one which arose out of the operations embraced by the contract."

█ It is our opinion that the language of the disclaimer in this case is sufficiently broad to include nonliability for negligence of Appellant and its consequences in regard to the use of the paint and the "end result" of such use.

The evidence tends to show that no contract was made between the parties until and except as each batch of paint was ordered and the order accepted. We quote from the testimony of Appellee's president, Mr. Maurice Cole:

"Q There wasn't a thing in the world that the Sherwin-Williams Company could have done to you, or The Perry Company, if you changed your mind and decided you didn't want to buy any, was there?

A No sir.

Q The Sherwin-Williams Company sure didn't have to sell to you, if you didn't want to buy from them, I mean that you didn't have to buy from them, if you didn't want to?

A That is correct."

If the nonexistence of a prior contract is established on retrial the case of Davis v. Ferguson Seed Farms, 255 S.W. 655, Tex. Civ.App., Beaumont, no writ, where a prior contract containing a warranty was held unaffected by a disclaimer attached to seeds when delivered is inapplicable.

Appellant concedes that its disclaimer is ineffective unless brought to Appellee's attention. It requested issues as to whether the disclaimer was seen or read by officials of The Perry Company or whether they should have been seen or read. In our opinion, these issues, in proper form, should be submitted to the jury if supported by pleadings and evidence on retrial.

Appellant's point of error number six is the error of the court in holding it liable on an implied warranty of fitness.

We sustain this point.

Appellant contends that liability under the theory of implied warranty was apparently attempted to be submitted in Special Issues Nos. 8, 9 and 10 in response to which the jury found that prior to November 23, 1964, Appellant's salesman "directed" Appellee in considerable detail as to how the Super Kem Var M and the Cabosil should be applied to the diving boards, that Super Kem Var M as so applied was not a suitable finish for the boards and that Appellee's use of the paint in that manner was a proximate cause of Appellee's damage.

In view of the position we have taken on the "disclaimer" and express warranty point here, the theory of implied warranty has no support.

Appellant's points of error numbers seven and eight, briefed together, are the error of the court in holding that there was evidence to support the jury's affirmative answers to Special Issues numbers 13 and 16.

In Special Issue No. 13 the court inquired whether or not it was negligence for L. W. Smith (Appellant's salesman) to fail to direct Appellee to apply two coats of Super Kem Var M under and in addition to the sand tread if he failed to give such direction, and in Special Issue No. 16 whether or not it was negligence for him to "direct" Appellee to add Cabosil to Super Kem Var M paint applied to the sand tread area, if he gave such direction. The jury answered both issues in the affirmative.

Appellant contends that the judgment of the trial court cannot be defended on the ground of negligence on the part of Appellant's salesman for two reasons, viz., there was no duty on his part to Appellee; that the salesman could not have foreseen the consequences, but on the other hand Appellee should have foreseen them. Appellant cites Shell Oil Company v. Mahler, 385 S.W.2d 684 (Tex.Civ.App. Fort Worth

1964, writ ref'd n. r. e.); Parker Food Stores, Inc. v. Pierce, 374 S.W.2d 699 (Tex. Civ.App. Fort Worth 1964, writ ref'd n. r. e.), among others, on the no duty point. On the foreseeability point City of Dallas v. Maxwell, 248 S.W. 667, 27 A.L.R. 927 (Tex.Com.App.1923), among others.

Appellee cites Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S.W. 517 (1922) for the proposition that one who undertakes particular conduct which he has no obligation to perform in the first instance is charged with the duty to exercise ordinary care with respect thereto. See also Missouri K. & T. Ry. Co. v. Wood, 95 Tex. 223, 66 S.W. 449, 56 L.R.A. 592 (1902), among others.

■ With respect to foreseeability, Appellee contends, first, that the jury properly found not only that addition of Cabosil to the M paint was a proximate cause of plaintiff's damages, but also that the failure of defendant's salesman to direct Appellee to apply two coats of M paint under and in addition to the sand tread was a proximate cause of Appellee's damage. Thus, inadequate paint film thickness for the sand tread area was found to be one of the proximate causes of Appellee's damage, which Appellant's salesman should have foreseen. Secondly, because as defined in the court's charge, foreseeability is not a subjective test, but an objective one of what "a reasonable prudent person, in the exercise of ordinary care, should have reasonably foreseen or anticipated. City of Dallas v. Maxwell, supra. Appellee's position is correct here and will be sustained if, in view of another trial, it is supported by the proper findings and by the evidence.

### III.

Appellant's ninth and tenth points, briefed together, are the error of the court in refusing to submit Appellant's Special Issues 3 and 4.

We cannot sustain this point inasmuch as the issues are not supported by the pleadings.

Our statement under point number 5, supra, relative to the disclaimer contained in the acknowledgment of orders is referred to here. The only additional statement required at this point are the issues 3 and 4 which, in effect, inquired whether Mr. Maurice W. Cole or Mr. Edgar H. Perry, III, on behalf of The Perry Company, saw or read the limitation of liability or disclaimer contained on the acknowledgment of orders sent by Appellant to The Perry Company, and, whether or not an ordinary prudent person in the exercise of ordinary care would have read the limitation of liability or disclaimer on the acknowledgments of orders sent by Appellant to The Perry Company. Should the pleadings be amended, the issues are germane and should be submitted.

Appellant's point of error No. 11 is that of the trial court in submitting Special Issue No. 27 over defendant's objection that it permitted the recovery of double damages, in that under the only evidence on the subject the value of good will supposedly lost by plaintiff as inquired about in Special Issue 28, necessarily included loss of profits for 1966.

We sustain this point.

The court submitted Special Issue No. 27 as to the amount of damages sustained by Appellee because of loss of profits for 1966 and Special Issue No. 28 as to its damage sustained for loss of good will.

■ In its brief Appellant concedes that under a proper showing damages can be awarded for both loss of profits and loss of good will. This is a correct statement under the law. Ewing v. Wm. L. Foley, Inc., 115 Tex. 222, 280 S.W. 499, 44 A.L.R. 627 (1926); Texas & P. Ry. Co. v. Mercer, 127 Tex. 220, 90 S.W.2d 557, 106 A.L.R. 1299 (1936); City of Dublin v. Hicks, 120 S.W.2d 872 (Tex.Civ.App. Eastland 1938, no writ).

The only testimony regarding the value of the good will of the business was that of Mr. Ben Barr, senior member of Appellee's

accounting firm, and he testified substantially that anyone buying the good will of a business would expect to recoup the money he paid for the good will from the profits of the business in five years.

A part of Mr. Barr's testimony on this point is as follows:

"A By one computation of profits, I would say the value of good will roughly, was $255,000.00, or was, immediately before the defective production.

Q And what is the basis of that computation?

A I assume that anyone buying the business would want to receive a payback, get his money back through profits, in a five-year period. That is, profits in a five-year period would reimburse him for what he had to pay for good will. * * *"

In response to Special Issue No. 27 the jury found the amount of lost profits for 1966 to be $15,000.00 and the value of the loss of good will to be $75,000.00—exactly five times the profit for one year, evidently in deference to Mr. Barr's formula.

■ This evidence of the value of good will is insufficient to uphold the award made. A suggested formula for evaluating good will is stated in Taormina v. Culicchia, 355 S.W.2d 569 (Tex.Civ.App. El Paso 1962, writ ref'd n. r. e.).

Points of error 12 through 18 complain of the jury's answer to certain special issues as being greatly against the weight and preponderance of the evidence. In view of the position we have taken in this case, it would be futile to discuss these evidentiary issues.

Likewise, we will not discuss Appellant's points numbers 19 and 20 which deal with the amount of the judgment being excessive.

We reverse this judgment and remand the cause for a new trial.

Reversed and remanded.