**RAILROAD COMMISSION of Texas et al.,**
**Appellants,**

v.

**SOUTHERN PACIFIC COMPANY,**
**Appellee.**

**No. 11822.**

Court of Civil Appeals of Texas,
Austin.

May 12, 1971.

Rehearing Denied June 16, 1971.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Thomas F. Sedberry, Asst. Atty. Gen., Austin, Rankin, Kern & Martinez, H. H. Rankin, Jr., McAllen, for appellants.

McKay & Avery, John J. McKay, Austin, for appellee.

O'QUINN, Justice.

Southern Pacific Transportation Company, formerly Southern Pacific Company, applied to the Railroad Commission for authority to discontinue the company's railroad agency at Elsa, in Hidalgo County, and to transfer that agency's duties to Edinburg, a distance of about twelve miles. In its technical aspects the application sought to discontinue the existing agency, retire the depot, and change applicable tariffs to show Elsa as a non-agency station.

The Railroad Commission entered an order dated October 22, 1968, denying the application.

Southern Pacific filed suit in district court in Travis County under Article 6453, Vernon's Anno.Civ.Stat., seeking cancellation of the order and authority to discontinue the agency at Elsa. The City of Elsa, Plastics, Inc., R. M. Nelson, Agnew Grain Company, Red Barn Chemicals, Inc., Dixon Concrete Product Company and Elsa Lumber Yard, Inc., intervened and participated in proceedings in court without objection.

After hearing before the court without a jury, the trial court held that the substantial evidence did not support the order of the Railroad Commission and entered judgment setting aside the order.

We reverse the judgment of the trial court and render judgment sustaining the order of the Commission.

The Commission has appealed and brings four points of error. Under the first point contention is made that the trial court erred in admitting in evidence seven exhibits which the Commission asserts "are patent hearsay and not admissible evidence under Article 3737e, Vernon's Anno.Civ.Stat."

The exhibits referred to are briefly described by number and content in the summary which follows. The seven exhibits purport to cover operations of the railroad at Elsa over a period of about two years prior to the hearing. Exhibit 13 is a summary of revenues and expenses for Elsa; exhibit 15 is a summary of train stops at Elsa; exhibit 16 covers the work load of the agent; exhibit 18 reflects carload movements through the station; exhibits 19 and 20 cover revenues from cotton shipments and less than carload shipments, which are not handled by the railroad; and exhibit 21 is an abstract of a large mass of railroad records upon which some of the exhibits mentioned above were founded. This exhibit was prepared by agreement for convenience of the court and of counsel, without waiver by the Commission of the right to object to its admission.

All of the exhibits were introduced through Phil H. Boudreaux, Jr., a witness for the railroad, who for twenty-eight years had been employed by the company, the last twelve years in making cost analyses.

The last named exhibit, No. 21, purports to be an abstract of other evidence of the railroad. The other evidence consisted of a mass of documents, estimated by counsel for the railroad as "four feet by two and a half feet by about three feet," which were made available in court during the latter part of the testimony of Boudreaux and afterwards were admitted in evidence. This bulk of evidence in the main comprised volumes of system-wide computer printouts. Boudreaux as the witness to testify as to the manner of making the records and

as to their accuracy was not certain about how many stations were included in the print-outs, saying, " * * * it is pretty close to sixty stations."

■ Business records, even when voluminous and massive, are admissible as an exception to the hearsay rule when a proper predicate is established under Article 3737e, Vernon's Anno.Civ. Stat. The party offering any such record must show:

"(a) It was made in the regular course of business;

(b) It was the regular course of that business for an employee or representative of such business with personal knowledge of such act, event or condition to make such memorandum or record or to transmit information thereof to be included in such memorandum or record;

(c) It was made at or near the time of the act, event or condition or reasonably soon thereafter." (Sec. 1, Art. 3737e)

The Supreme Court held in 1969 that a tabulated schedule or summary of voluminous records may be admitted, in the discretion of the trial court, to expedite trial and aid of the trier of fact, but that this rule assumes that the records themselves are admissible. Cooper Petroleum Co. v. La-Gloria Oil and Gas Co., 436 S.W.2d 889 (Tex.Sup.1969). The summaries tend to prove nothing except the contents of the records themselves and standing alone the tabulations, or summaries, are hearsay and have no probative value.

■ Exhibit 21, as noted, was prepared as an abstract of the numerous massive volumes of computer summary sheets. The witness Boudreaux was not qualified as the custodian of the records, nor was he offered as the railroad employee having sufficient knowledge of the records to prove the legitimacy and accuracy of the computer print-outs.

The railroad offered no witness who was in charge of its data processing department, and under whose supervision the computer-ized accounting records were maintained, to testify as to the type of computer employed, the permanent nature of record storage, and how daily processing of information to be fed into the computer was conducted, resulting in permanent records of the railroad.

A similar question, although not involving electronically kept records, was met by this Court in Sherwin-Williams Company v. Perry Company, 424 S.W.2d 940 (Tex.Civ. App., Austin, 1968, writ ref., n. r. e., per curiam opinion, 431 S.W.2d 310), in which it was held that if the voluminous books and records of plaintiff had been produced in the trial court and offered in evidence, they would have been hearsay as to defendant, but upon proper predicate may have been admissible. The testimony of examiners or auditors as to contents of the books "without this predicate was double hearsay."

In that case it was observed: "In this era of big business, voluminous records may well become the rule rather than the exception. It is difficult * * * to believe that where records are an integral part of * * * [plaintiff's] case, that merely by making a welter of records accessible to an opposing party * * * the burden is shifted to the opposing party, making it his duty to cull out any barriers to admissibility that may be inherent therein. These records are hearsay and any testimony rooted therein is hearsay spawned in hearsay." 424 S.W.2d 946, col. 2.

It was not enough that the railroad hauled a "cartload" of records into the court room and proffered an abstract as proof of facts said to be contained in the records themselves. Exhibit 21 and the records it purports to be based on did not meet the tests required by Article 3737e and the cases decided construing the statute.

■ Business records kept electronically no doubt have become increasingly prevalent, and although the several facts necessary to show that such records are trustworthy will differ in some details from proof by which reliability of conventional

records under the "shop book rule" is established, the basic requirements remain unchanged. The ultimate proof to be established under Article 3737e should · be accompanied, in the case of electronic records, by proof that the particular computing equipment is recognized as standard equipment, that the records kept and stored electronically were made in the regular course of business, that they were based on information within the personal knowledge of a person whose duties included the collection of such information, and that the records were prepared by persons who understood operation of the equipment and whose regular duty was to operate it. (See 11 ALR 3rd 1377 and cases cited; also, King v. State for Use and Benefit of Murdock Acceptance Corp., 222 So.2d 393 (Miss.Sup. 1969) citing ALR annotation).

In the case before us exhibits 13, 15, and 18 were based wholly or in substantial part upon exhibit 21 which itself was but an abstract of the electronically kept records. Exhibit 16 designed to show work of the agent at Elsa was based on freight waybills and other records of the agent. Exhibits 13 and 18 were based in part on the Elsa waybills, in addition to exhibit 21. Boudreaux testified that waybills were basic railroad documents showing car movements, but waybills and freight bills from Elsa were not offered in evidence. Exhibit 19 pertaining to truck movement of cotton appears to be based on various records not tendered in court by the railroad. Exhibit 20 dealing with less than carload shipments, which are made by truck and not by rail, appears to be grounded on similar records not in court and not offered in evidence. Thus it is seen that the railroad's offers to show revenue and expenses at Elsa, the number of train stops, the work of the agent, carload movements through Elsa, and the revenue derived from truck shipment of cotton and less than carload lots of other cargo were made almost entirely through hearsay evidence improperly admitted by the trial court.

■ The trial court overruled all objections, which were timely made to admission of the several exhibits, and admitted the evidence expressly "under the business records exception." The railroad insists that some objections were not timely made and therefore were waived. Hearsay evidence, even if admitted without objection, remains incompetent evidence and may not be considered in applying the substantial evidence rule. Gerst v. Gibraltar Savings Association, 413 S.W.2d 718 (Tex.Civ.App., Austin, 1967, writ ref., n. r. e., per curiam opinion, 417 S.W.2d 584 (Tex.Sup.1967).

Some proof was made of Boudreaux's qualifications as an expert in cost analysis for the railroad. We will examine Boudreaux's conclusions and opinions, based on his investigations, in more detail in our consideration later of the question of substantial evidence.

■■ In our review of the record to determine whether the order of the Railroad Commission is supported by substantial evidence we are guided by well settled rules. We cannot disturb the finding of the Railroad Commission and substitute our judgment for the Commission's order if there is any substantial basis in evidence for the order or if the order is not capricious or arbitrary but is reasonable and lawful. Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W.2d 505 (1934). Whether there is substantial evidence affording reasonable support for the order is a question of law to be determined by the courts, and in reviewing the fact findings of the Commission no question of the preponderance of the evidence is involved. Thomas v. Stanolind Oil and Gas Co., 145 Tex. 270, 198 S.W.2d 420 (1946). A mere scintilla of evidence will not suffice to support the order of the Commission. If upon consideration of the record as a whole there is found substantial evidence upon which reasonable minds could have reached different conclusions, the conclusion of the court may not be made to supplant that of the Commission. Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d

424 (1946); Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942).

■ The agent at Elsa, a town of about 4,200 inhabitants, services in addition to Elsa the communities of LaVilla and La-Blanca. Southern Pacific is the only railroad serving Elsa, this service affording two trains a day, with one additional train at times during busy seasons. The trains are "mostly night operations" when the agent is usually off duty. Elsa is about twelve miles distant from Edinburg, the station to which the Elsa agency would be transferred if discontinuance at Elsa should be approved. The agent at Elsa and at Edinburg observe about the same office hours, from 8 o'clock in the morning until 5 o'clock in the afternoon, for five days a week. A clerk stays on duty at Edinburg until midnight. The two stations are on the same telephone exchange, and if the Elsa agency should be closed the primary contact between rail customers in Elsa and the railroad would be by telephone for spotting of freight cars. Most rail traffic originating in Elsa moves through the Edinburg yard.

Under existing arrangements, the railroad maintains a deposit box at Elsa for waybills to be signed by the train conductor. Billing has been centralized in Houston for some time with most freight payments made by mail to Houston. Non-credit patrons in Elsa pay the agent, and if the Elsa agency should be closed, these patrons would be obliged to pay in Edinburg. There was testimony that one-day mail service exists between Elsa and Edinburg.

Fred G. Ryberg, trainmaster in the San Antonio Division through 1968, testified that the Elsa agent was needed elsewhere and that overtime paid the agent at Elsa was an unnecessary expense. Without specifying in what manner money would be saved the railroad by transfer of the agent, Ryberg testified that he could use the man to better advantage at another station and that closing the Elsa station would save "some money." The record shows that the Elsa agent works overtime.

It is undisputed that passenger service at Elsa was discontinued in 1958, that since 1964 motor truck services of the company have not been handled by the rail agent, and that the agent has no duties concerning railway express, United States Mail, or Western Union.

Ryberg could not testify as to handling of papers, such as freight bills and waybills, by the Elsa agent, and did not know whether carload traffic revenue had increased or decreased from 1960 to 1968, but was permitted over objection to testify that in his opinion continuation of the Elsa agency would be "an economic waste." Ryberg conceded that because of a shortage of "the best newer cars" there existed "quite a fight sometimes" among the shippers for better cars and that the local agent could help the shipper "by pushing for him."

Ryberg was the only witness presented by the railroad who had operations experience. The witness Boudreaux, mentioned earlier, was identified as supervisor of field data control for the railroad. Boudreaux qualified as a statistician working in cost data and analysis of revenue and expenses at stations through Louisiana and Texas, an activity in which he had engaged since 1958. He testified that he had made many agency work and cost studies, and had "been analyzing the revenues and expenses at Elsa * * * for the last eight years," during which time he had frequently made "trips to the Elsa depot," where he "observed the agent at work." It was Boudreaux's testimony, which does not appear in dispute, that duties of agents at various stations have decreased with installation by the railroad of "modernization procedures such as central accounting, central billing, and that sort of thing."

Boudreaux testified that he made "a traffic and expense study at Elsa * * * for the purpose of the hearing in 1968" before the Railroad Commission. A study made by Boudreaux was introduced in the trial

court as exhibit 13, over objection by the Commission that the railroad had made no attempt to establish a proper predicate for admissibility of the records underlying the exhibit, such underlying records being freight bills, waybills, and other original records involved.

Assuming, for purposes of further examination of the evidence, that Boudreaux was qualified as an expert in making cost analyses for the railroad, if his opinions and conclusions were based substantially on agency records and central accounting records of the railroad, the records being hearsay as to the Commission should have been introduced as business records under the exception accorded by Article 3737e. Without introduction of the records, the opinions expressed as an expert are based almost entirely on hearsay. Although Boudreaux testified that he frequently visited Elsa and personally observed the agent at work, his report (exhibits 13, 16 and 18) admittedly was based largely upon records at the station and central accounting records of the railroad as found in the computer sheets. He noted discrepancies between the agency records and the central accounting records which he corrected for his report. Boudreaux's summary of train stops (exhibit 15) was taken entirely from exhibit 21, the abstract of the electronically kept records which we have held were not admitted in evidence as required by Article 3737e as an exception to the hearsay rule. Hearsay will not become relevant and substantial merely because it is offered through an expert witness if the facts are not known to the witness or proved to be true. (See 31 Am.Jur.2d, Expert and Opinion Evidence, secs. 36 and 37).

Part of Boudreaux's report (exhibit 13) showed a net gain, or "contribution to overhead," of $13,646.08 for Elsa, but the witness expressed the opinion that the railroad would make a saving of $16,533.41 by closing the agency. The saving was not explained by Boudreaux, nor was the computation by which it was arrived at put in evidence. By exhibit 15, a summary of train sheets, Boudreaux sought to show that the Elsa agent was on duty little more than twenty-two percent of the time when train operations were underway, due to the fact that most train movements occurred at night. The record shows that train movements at night were an accommodation to Elsa shippers who loaded and unloaded their cars in daytime.

Boudreaux testified under cross examination that in his study of revenue and expense at Elsa he did not include revenue derived from leased portions of the station, although as an expense he included utilities, and that he did not include revenues derived from less than carload lots hauled by truck. Boudreaux did not include the agent's overtime as an expense, although he found that the agent worked overtime. Boudreaux conceded that between 1963 and 1968 carloads assignable to Elsa increased from 183 in 1963 to an annual average of 355 for 1967 and 1968. The witness described shipment in and out of Elsa as partly seasonal, the "biggest seasonal" being "grain outbound," but could not recall whether his observations of the agent at work were made during the busy season.

The Commission presented four witnesses in support of the order refusing authority to close the agency. All of the witnesses were identified with business or industry in Elsa using the railroad's facilities as shippers or receivers of cargo.

The witness Sam Moore was a partner in Agnew Grain Company, a grain and corn dealership in Elsa. The busy season for the grain company extends from June through August each year, and during 1966 the company shipped 193 cars, 123 in 1967, and 87 in 1968 prior to the hearing in October. The company competes with companies in Edinburg, San Carlos, and McAllen. Moore testified that he uses the Elsa agent in obtaining clean, usable grain cars; that he and the agent evaluate the cars delivered and agree as to which cars are acceptable; and the agent assists grain shipments by having rejected cars removed and adjusting the next day's order to in-

clude additional cars in lieu of the cars rejected the day before. Moore considered his need for cars as critical because the grain volume is large and the grain company itself has limited storage.

Moore testified that cars for grain shipments require grain boards, a laminated paper door cover that by partially covering the car door prevents spillage. The agent presently supplies the boards in various sizes. Without the agent, Moore would have to store the doors, some of which are large, at his plant, or would have to drive to Edinburg for the covers, either alternative causing a delay and inconvenience, especially in the busy season. Under present arrangements with the agent, Moore goes to the station to get bills of lading signed, sometimes after hours. This service enables Moore to process his invoices. Next morning on receipt of the weight slips from the conductor, the agent delivers them to Moore, enabling him to complete paper work and bill his customers. Moore is authorized to draft his customers, making it important to the grain company, which pays cash for the grain, that the agent speeds up processing bills of lading and weight slips. Moore knew nothing about the waybill box in Elsa, but was not satisfied it could replace the agent's services. On occasions, after hours, Moore had called Edinburg to request cars for the next day, and at times was unable to find the agent there.

The witness Frank A. Smith testified that he owns a lumber company in Elsa and had received lumber by rail since 1945. In the years 1966, 1967 and in 1968 before the hearing Smith had received five carloads. Smith relied on the agent to advise him of car arrivals, a service important to the lumber business since work forces had to be arranged to handle unloading. The agent also assisted in tracing cars and receives payment of freight on delivery of each car. Smith is a cash customer of the railroad. Prompt payment of freight and the unloading and checking of the lumber are important to Smith who also pays cash

for the lumber to obtain discounts, a process that must be completed in ten days.

The witness Dale Goetzinger was the Elsa dispatcher for a chemical company in 1966, 1967, and 1968. The company received 142 carloads in 1966, 82 in 1967, and 76 during the first nine or ten months of 1968. Goetzinger testified that larger, or "jumbo", cars were used in 1967 and 1968, accounting for the lower number of cars, since the company's business continued to grow during that period. The chemical company has eight specified unloading spots where it receives both liquid and dry fertilizers. Goetzinger relied on the agent for help in tracing, spotting, and picking up cars. Most of the fertilizers arrive during the growing season, and the agent's help in efficient location of cars for unloading was of vital importance to the company.

When asked about using Edinburg instead of the agent at Elsa, Goetzinger testified the arrangement would not be satisfactory, based on his past experience. On an occasion when the Elsa agent was away and a substitute on part-time basis took his place, Goetzinger found difficulty in locating the Edinburg agent. Since the chemical company receives different types of products, each car should be spotted at the proper unloading space, a matter the Elsa agent handles for the company. Goetzinger testified that high demurrage charges during absence of the Elsa agent were incurred through inadequate service from the Edinburg agent.

The witness Keith Maurer testified regarding experience of a plastics concern at Elsa with the railroad agent. Maurer was extrusion superintendent for the company in 1967 and 1968, with responsibility for rail shipping and receiving. The company receives plastic pellets by gravity flow cars, and in 1966 received 42 cars, received 40 in 1967, and through October of 1968 received 41 cars. The agent assists in spotting cars at four track locations. The plastic pellets are pumped into silos for storage from the several locations, three of which have large

pumps. The agent also assists in having various cars switched on sidings in order to utilize the unloading pumps. Maurer testified that the agent helps in tracing cars, and the witness related a specific instance in which a car out of Longview had been traced by the Elsa agent and found in Fort Worth. Maurer stated that the agent called Maurer every day that a car was being unloaded to determine its status in order to help avoid demurrage charges.

The record does not reflect that the railroad is experiencing "economic waste" or loss of net gains through its agency at Elsa, nor was there a showing that use of the Edinburg agency in lieu of the one at Elsa would not impair rail service at Elsa. This Court is aware from this record and records reviewed in previous cases that the railroad in fairly recent years has instituted changes and modern improvements to increase the efficiency of operations on its lines. But this record fails to disclose in what manner these innovations would serve to maintain or increase the railroad's service to the public at Elsa after discontinuing the agency there and substituting for it the agency at Edinburg. The Commission reached the determination that the convenience and necessity of the shipping public at Elsa required continuing maintenance of the agency. The reliance of the shipping public upon the agent and his services was demonstrated by the several witnesses who described the shipping and receiving operations of substantial and vital industries in the community. The record is lacking in a showing of economic benefit to the railroad by closing the Elsa agency or proof that the agent is not needed.

We conclude that the order of the Railroad Commission refusing authority to discontinue the agency at Elsa is supported by the substantial evidence and that the judgment of the trial court setting aside the order should be reversed.

We reverse the judgment of the trial court setting aside the order of the Railroad Commission and render judgment approving the order as supported by the substantial evidence.

Reversed and rendered.