**SOUTHMORE SAVINGS ASSOCIATION,**
Appellant,

v.

**W. Sale LEWIS, Savings and Loan Commissioner et al., Appellees.**

No. 11816.

Court of Civil Appeals of Texas, Austin.

April 28, 1971.

Rehearing Denied May 19, 1971.

---

Thomas F. Lay, Pasadena, Heath, Davis & McCalla, Dudley D. McCalla, Austin, for appellant.

Crawford C. Martin, Atty. Gen., Phil Warner, Asst. Atty. Gen., Austin, Alvis & Carssow, C. E. Alvis, Jr., Rogers & Hughes, Johnnie B. Rogers, Austin, for appellees.

O'QUINN, Justice.

Southmore Savings Association brought this suit in district court of Travis County seeking to reverse an order of the Savings and Loan Commissioner granting application for a charter for Modern Savings and Loan Association, a proposed association to be operated on Spencer Highway in Pasadena, Harris County, Texas.

Applicants for the charter filed a petition in intervention in the name of Modern Savings and Loan Association, a non-existent corporate entity, to which Southmore as petitioner made no formal objection insofar as the intervention referred to the proposed incorporators as the named corporation.

After trial before the court judgment was entered in July, 1970, overruling all objections made by Southmore to the admission of certain evidence and declaring valid the order of the Commissioner granting a charter to the proposed new association.

Southmore is before this Court as appellant with nineteen points of error. The first sixteen points present issues as to the effect of admission and consideration by the Commissioner of hearsay evidence offered by applicants for the Modern Savings charter and error of the trial court in admitting the same evidence in district court. The remaining points of error are on the issue of whether the Commissioner's order and the findings recited in the order are reasonably supported by substantial evidence.

The sixteen points of error on the issues of hearsay evidence are based on testimony and documents introduced at the hearing before the Commissioner through three witnesses.

Points 1 and 1A through 3 and 3A relate to the testimony of J. R. McDonald and exhibits introduced through him. The Commissioner permitted McDonald, a resident of Pasadena engaged in banking and insurance, to testify, from what he had seen in newspapers and what he had heard, that an "East Belt" thoroughfare to connect with "Greater Houston" had been designated and approved by the State Highway Department and the Commissioners' Court of Harris County and that some of the right-of-way had been purchased for the proposed project.

The Commissioner also permitted the introduction through McDonald of a printed "Development Plan for Pasadena, Texas", consisting of 200 pages of maps, charts, and editorial matter, purportedly prepared by private planning consultants, and adopted by the City Council by resolution as a plan of development for Pasadena. Upon the reading of excerpts from the printed mat-

ter, relating in the main to forecasts as to population growth between 1960 and 1990 and "estimated growth prospects," the witness was permitted to testify that he concurred in the views there expressed, based on his own experience and observations as a resident for twenty-two years, and from his experience in banking and insurance.

Lastly, the Commissioner permitted introduction of a letter, purportedly from a city building official to McDonald, setting out the total value of building permits in Pasadena for the years 1963 through 1968.

Timely objections were made to the several exhibits offered through McDonald and to the witness' testimony regarding a proposed thoroughfare and his statements concurring in the forecasts and projections contained in the planning report of the consulting firm. The Commissioner, in admitting McDonald's testimony as to what he had heard and read in the newspapers about the proposed thoroughfare and his concurrence in the views expressed in the report of the planning consultants, expressed the view that the objections went more to the weight of the evidence than to its admissibility. No witness who had prepared the planning report or the letter regarding value of building permits was offered.

Under points 4 and 4A through 7 and 7A matters introduced through Dr. F. S. Yeager, described as a "research economist," a resident of Houston, are characterized as hearsay which appellant urges the Commissioner and the trial court erred in admitting in evidence.

Through Dr. Yeager appellees were permitted by the Commissioner to introduce certain statistics admittedly gleaned by the witness from "1967 Statistical Abstract" and "Survey of Financial Characteristics of Consumers."

Dr. Yeager described the statistical abstract of 1967 as "an annual publication of the U. S. Department of Commerce which collects statistical data in all forms of Gov-

ernment Agencies. The material that I used to deal with in financial matters comes from the Securities and Exchange Commission, the Federal Reserve Board, and the individual Federal Reserve Banks and commercial banks of the nation, so that it is a collection, a compilation published annually for information for people like me to have available the vast mass of statistical information of all types, not just financial, which are available through the different reporting agencies."

Timely objection was made that Dr. Yeager's extracted version of what the statistical abstract reported was hearsay and that the 1967 abstract itself was not available at the hearing to afford appellant opportunity to determine what part of the Yeager testimony was based on the publication.

Dr. Yeager based part of his testimony on material gathered by him from a publication of the Board of Governors of the Federal Reserve System. Objection was made that the material was hearsay and the publication itself was not made available at the hearing for examination.

Dr. Yeager's testimony apparently taken from these two publications pertained to "growth in savings of individuals" in various "selected forms or types of savings", to population increases nationally and locally in relation to financial savings, and to "distribution of the nation's savings among families, by income levels and by age groups."

While publications of the U. S. Department of Commerce, the Securities and Exchange Commission, the Federal Reserve Board, and the various banks mentioned by Dr. Yeager might well be considered valid sources upon which an economic expert could base an opinion, we think this material should be made available to the opposition so that its relevancy to the questions for determination could be tested before the Commissioner. Such official publications certainly would find wider acceptance in the ordinary conduct of

serious business affairs than materials prepared by private agencies and other sources hereinafter described.

Further testimony from Dr. Yeager in relation to new construction and mortgage loan needs, dollar volume of loans in the Pasadena area, comparison of local and total sources of mortgage funds, and specific summaries of real estate activity of two savings and loan associations in the area was admittedly based by him on a publication of a private agency known as "Dorran Reports."

Timely objection was made that the selected abstracts Dr. Yeager made from the Dorran Reports were hearsay and that the reports themselves were not produced at the hearing.

Dr. Yeager's written "Economic Report", introduced through him as a witness, contained certain exhibits which included an unidentified article about the growth of San Jacinto College, an unidentified article about "Greater Houston," a printed brochure from the Texas Commerce Bank, and an unidentified "Houston-Harris County Transportation Study." In his report Dr. Yeager stated that the last three of these exhibits " * * * discuss industrial expansion in the 8 counties [Harris and seven surrounding counties] and show future population estimates for Harris County."

Appellant objected to the exhibits which the Commissioner admitted after, under examination of Dr. Yeager by the Commissioner, the witness stated that in his "experience, knowledge and activity" he had "verified these facts that are contained in the newspaper clippings and" in the brochure of the Texas Commerce Bank and that in his "capacity as an expert economist" he could "say that the information contained in those [exhibits] are reasonably accurate."

Finally, the Commissioner permitted Dr. Yeager to testify, over objection, as to savings available in the Pasadena area through persons retiring from industrial employment who would be required to take their savings out of credit unions "when they retire from the company" and "would be making their savings available to this association" as a result. Objection was made that such testimony was "either purely speculative or hearsay and we object to it on either or both cases."

Counsel for appellees then asked Dr. Yeager, "Is this your opinion that you rendered, based on your knowledge and observation of the area?" To which Dr. Yeager replied, "Based on talking to Mr. Bonnette, who is going to testify here later and through him, talking to officials of the credit unions who gave me general information." The Commissioner then overruled the objections and admitted the testimony.

J. P. Bonnette, a later witness who testified that his business was "General Insurance," gave no testimony to support or confirm Dr. Yeager's testimony regarding availability to the proposed association of savings from credit union sources.

Under points 8 and 8A appellant urges error of the Commissioner and the trial court in permitting introduction of a nine-page "traffic count" in Pasadena to which was attached the authenticating affidavit of the city's planning director. The written traffic count and the attached affidavit were offered through John O. Harris, identified as a "realtor and developer" in Pasadena, who testified at the hearing. The witness had not prepared the report and testified that the "report stands on its own."

All of the testimony and the bulk of the written materials to which appellant objected, and the admission of which is preserved as error under points 1 and 1A through points 8 and 8A, constituted hearsay. Appellees charge that appellant "has carefully selected a few excerpts and references from the testimony," and that appellees " * * * do not concede * * * that the items cited by Appellant are hearsay." Appellees observe " * * * that

there is undoubtedly some hearsay in the record, injected both by Appellants and Appellees, but a judgment on the competency of any given testimony must fairly rest on an examination of the full context of the record." Appellees insist: "Suffice it to say that if we assume, for the purposes of argument only, that each instance cited by Appellant, is hearsay, nevertheless, no reversible error has been shown."

Appellees rely strongly upon the testimony of Dr. Yeager and insist that because of his "impressive academic and teaching background" and his "vast amount of experience in economic research analysis in industry" he was properly permitted to "draw conclusions and render opinions" on the "ultimate issues in the hearing." Appellees urge that "the Yeager opinions were given * * * based both on his study and analysis of the area and in some particulars on the opinions and reports of others, together with his own personal knowledge of the area."

The cases cited by appellees indicate that the opinion of an expert witness is admissible in court even when the opinion is based in part on hearsay. In Schooler v. State, 175 S.W.2d 664, Tex.Civ.App., El Paso, 1943, writ ref. w. o. m., the expert witness was a geologist who had made studies on the ground, read published and unpublished geological material of the area, and discussed the area with other geologists. The court stated, "The conclusions of an expert as to so technical a subject as the geological features of a defined area arrived at in part from study of unsworn reports prepared by other experts are analogous to the diagnosis by a physician based in part on unsworn reports of tests made by hospital technicians." (175 S.W.2d 670, col. 2)

The expert witness in Coffee v. William Marsh Rice University, 408 S.W.2d 269, Tex.Civ.App., Houston, 1966, writ ref. n. r. e., was an educator who was permitted to express an opinion regarding the probable effects that color and tuition restrictions

would have on the future of the university. The witness' opinion was that "of an expert * * * based on observations, conversations with others, reading and experience * * *" The cases there cited in support of the holding deal with admission of evidence for the purpose of showing the basis for the witness' conclusions.

Doctors were the expert witnesses in Martin v. Wholesome Dairy, Inc., 437 S.W.2d 586, Tex.Civ.App., Austin, 1969, writ ref. n. r. e., whose opinions were admitted, upon a showing of the technical qualifications of the doctors, their experience and studies in their respective fields. Their opinions pertained to the safety and nutritional value of a "filled milk product" without having tested the product.

In Bryant v. Trinity Universal Insurance Company, 411 S.W.2d 945, Tex.Civ. App., Dallas, 1967, writ ref. n. r. e., the expert witness expressed an opinion as to the origin of a fire "based largely on facts actually known to him or proved to be true." The testimony was held admissible although "he heard someone make a casual hearsay statement which perhaps had some slight part in the formation of his opinion."

We do not find in these cases authority to admit opinion testimony which is not based upon facts, proved or assumed, as in hypothetical situations, which are sufficient to form a basis for the opinion of the expert. Nor can the experts' opinion itself furnish the substantial facts needed to support his own conclusions. If the evidence upon which the opinion purports to be based is largely hearsay, is nebulous, or of a species deemed unreliable, it should be excluded, and when admitted by the Commissioner, becomes a matter for consideration of the courts reviewing the record in determining the issue of substantial evidence. (See text and cases cited, 31 Am. Jur.2d, Expert and Opinion Evidence, secs. 36 & 37).

In Texas Aeronautics Commission v. Braniff Airways, Inc., 454 S.W.2d 199 (Tex.Sup.1970), a poll testing the attitude

of satisfaction or dissatisfaction with existing air travel service was held admissible "whether * * * considered to be non-hearsay or within the state of mind exception of the hearsay rule." The expert witness had had twenty years' experience in making polls and had supervised more than 2,000 surveys. Since the witness testified about the survey, opponents "had full opportunity to investigate and develop any particular objections * * * to the methodology and execution of the poll." In addition, three of the interviewers employed to make the poll were present to testify, and other interviewers could have been called also to testify.

■ In the case before us the makers of the "Dorran Reports" were not present at the hearing, nor was the report itself made available, only the random excerpts selected by Dr. Yeager. The same was true of other materials, such as the statistical abstract of 1967 and a survey of financial characteristics of consumers. The conversation Dr. Yeager had with Bonnette about the chances appellees had of getting "peculiar and unique" access to savings funds from former members of industrial credit unions and the "general information" gleaned by Dr. Yeager from credit union officials constituted not only hearsay but was at best of a nebulous and speculative nature. The hearsay evidence admitted through nonexpert witnesses such as McDonald and Harris is in the record without the cloak of an expert's opinion. Hearsay or other incompetent evidence will not become relevant and substantial merely because it is offered through an expert witness when the facts are not known to the witness or proved to be true. (See 31 Am. Jur.2d, supra)

The Supreme Court in 1966 struck down the provision of the Texas Savings and Loan Act (Art. 852a, sec. 11.12(5) (b), Vernon's Ann. T.S.) for independent judicial decision based upon a preponderance of the evidence. The Court upheld validity of the provision in the statute for review of the record made before the Commission and in sustaining validity of the entire enactment read into it a provision for judicial review under the substantial evidence rule. Gerst v. Nixon, 411 S.W.2d 350 (Tex.Sup.1966). The Court held that by this enactment the legislature adopted "the rule that the Commissioner's order is to stand or fall upon the evidence adduced and matters noticed at the Commissioner's hearing."

■■ It is from the administrative record that the courts are to "determine whether or not the Commissioner's order is arbitrary, i. e., whether it is reasonably supported by substantial evidence. The circumstance that the record of the Commissioner's hearing contains hearsay or other species of evidence deemed unreliable is a matter for the consideration of the trial judge in determining the issue of 'substantial evidence'". (411 S.W.2d 357, col. 2)

It is settled that hearsay evidence is not substantial evidence upon which the Commissioner can base an order granting or refusing an application. Hearsay has no probative force, even though admitted without objection. Gerst v. Gibraltar Savings Association, 413 S.W.2d 718, 723, Tex.Civ.App., Austin, 1967, writ ref. n. r. e., per curiam opinion, 417 S.W.2d 584. Even official writings admissible in evidence by reason of Article 3731a, sec. 1, Vernon's Ann.Civ.Stat., may be necessarily hearsay and cannot serve to show that the Commissioner's order was supported by substantial evidence. Benson v. San Antonio Savings Association, 374 S.W.2d 423, 429, col. 1 (Tex.Sup.1963).

■ The savings and loan Act and the rules promulgated under the statute make it clear that a hearing before the Commissioner "is a different proceeding from the informal hearing considered by" the Supreme Court in Cook Drilling Co. v. Gulf Oil Corporation, 139 Tex. 80, 161 S.W.2d 1035 (1942) where validity of an order of the Railroad Commission was considered. Gerst v. Nixon, supra, 411 S.W.2d

357, col. 1. The statute requires that the record made before the Commissioner be filed with the district court, and no evidence is admissible that was not adduced at the hearing. Review by the courts is made upon that record.

The principal difference generally noted between substantial evidence review in Texas and that provided in the federal courts is that under the federal system review is limited to the record made at the administrative hearing. The decision in Gerst v. Nixon, supra, established an exception to the Texas rule and brought appeals from the Savings and Loan Commissioner in "closest approximation to the federal type review." Reavley, Substantial Evidence and Insubstantial Review in Texas, 23 Southwestern Law Jour. 239, 254 (1969). Review of the Commissioner's action is limited to the record made at the administrative hearing, unlike the record before other agencies which are not *per se* admissible in district court, the admissibility of such records depending upon their own merits under the general rules of evidence. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942); Guinn, Administrative Law, 24 Southwestern Law Jour. 216, 226 (1970); Guinn, Judicial Review of Administrative Orders, 23 Baylor Law Rev. 34, 39 (1971); also, Comment, 44 Texas Law Rev. 966, 972, fn. 41.

After examining the holdings in Gerst v. Gibraltar Savings and Loan Association, supra, Justice Reavley in the article cited above observed:

"The question suggested by *Gibraltar* is whether all evidence that would be inadmissible in a judicial trial should be excluded from an administrative record. The federal rule and the majority rule in the state courts is that evidence can be considered, though inadmissible in a judicial trial, if it appears to be sufficiently trustworthy to be relied on in the ordinary conduct of serious business affairs, *provided there is other competent evidence looking in the same direction.*" (Emphasis added)

The courts of other states do not appear to be in complete harmony in their treatment of hearsay evidence in matters pertaining to granting or revoking business licenses and permits. 36 A.L.R.3d 12, 74–5. Authorities more in harmony with decisions of the courts in this State apply the rule that the findings of an administrative agency "must be supported by substantial and competent evidence and that it cannot make a finding based upon hearsay." By striking down the requirement that an order of the Savings and Loan Commissioner "shall be redetermined in such trial [judicial review] *on the preponderance* of the competent evidence," (Emphasis added) the Supreme Court did not additionally hold that the "substantial evidence" required to uphold the order could be other than "competent evidence."

Returning to the question of whether all evidence should be excluded from an administrative record that would be inadmissible in court, we are confronted with the present reality that the record before us is bloated with hearsay, that a substantial part of the testimony of appellees' expert witness was based upon hearsay materials, and that his 35-page "economic report", introduced at the hearing, was formed in large part from hearsay materials, which were not made available at the hearing. Any fair attempt to distill from the record before us the reasonable and credible facts and opinions, not grounded upon or substantially colored by hearsay, becomes an unnecessarily burdensome task attended by results of doubtful complete accuracy. We share with Justice Reavley the hope that when problems of the Savings and Loan Act are worked out by the courts, "such a beginning will lead to legislative adoption of an administrative procedure act for Texas." (23 Southwestern Law Jour. 254–55)

The Savings and Loan Act required that procedural safeguards be provided at the agency level. Adversary hearings preceding agency determinations are required by statute, upon request of a contesting party,

and a formal record must be kept of the hearing. These requirements have been supplemented by regulations, such as place witnesses under oath and provide for reporters to record testimony. The Commissioner's decision in a contested matter must be in writing and incorporate findings of fact and conclusions of law on all material issues.

Statutory provisions require findings by the Commissioner that: (1) there is a public need for the proposed association, (2) the volume of business in the community in which the proposed association will conduct business is such as to indicate that the association may be profitably operated, and (3) operation of the proposed association will not unduly harm any existing association.

Such general findings, or conclusions, were recited by the Commissioner in his order. In reviewing the record to determine whether the conclusions are supported by substantial evidence we must examine the facts upon which the Commissioner expressly based his conclusions and set out in his order, as well as any other facts found in the record that tend to support the ultimate conclusions. The order of the Commissioner consists of approximately two typewritten pages. About half of the order is devoted to formal recitations, with the findings of fact condensed to one page.

This Court held recently that the Commissioner has a statutory duty to make and set out findings in support of conclusions reached in his order. Gonzales County Savings and Loan Association v. Lewis, 461 S.W.2d 215, Tex.Civ.App., Austin, 1970, application for writ of error filed in Supreme Court January 29, 1971, No. B–2536.

In finding a public need for a new association in a given trade area, the Commissioner must be guided by the definition announced by the Supreme Court in Gerst v. Nixon, supra:

" * * * a substantial or obvious community need for the proposed association in the light of attendant circumstances, as distinguished from a mere convenience on the one hand and an absolute or indispensable need on the other." (411 S.W.2d 358, col. 2)

The Commissioner, on the issue of public need, made the following conclusions:

"The economic data submitted indicates the availability of substantial savings funds which have not as yet been attracted to either banks or savings and loan associations within the trade area. Also, the evidence shows that the need for mortgage funds in the trade area far exceeds the financial resources of the savings associations which maintain home or branch offices in the trade area."

No reference is made in the order to evidence supporting such conclusions. We find in Dr. Yeager's economic report a statement that: "The need of households as savers, and of households as investors in new residential capital, are such that they cannot be met adequately by the two existing home offices and the six branch offices of Pasadena and Houston savings associations."

The trade area recognized by the Commissioner includes Pasadena, Deer Park, and a smaller area designated South Houston. The total population of the area at the time of the hearing was estimated to be 104,000, with Pasadena having approximately eighty percent of the total population. The area geographically is bounded by LaPorte Road on the north, Galveston Road on the west, Genoa-Red Bluff Road and its easterly extension on the south, and on the east by a line about half way between Deer Park and LaPorte. It was conceded that the proposed association was not intended to serve the Houston metropolitan area.

Both Dr. Yeager, testifying for appellees, and Ward Neff, an economist who testified for appellant, agreed that the rate

of population growth for Pasadena decreased in the decade following 1960 in comparison with the preceding ten years. The two economists were agreed also that the community was one of young people whose inclination to save money in financial institutions was below average.

Another economic characteristic of the trade area, affecting availability of savings and loan institutions, was shown to be the large number of credit unions found in the industrial areas, particularly along the Houston ship channel lying immediately north of the trade area.

Although Dr. Yeager did not include the factor of credit unions in his report, the record shows that some sixteen months earlier, in a different hearing before the Commissioner involving other parties, Dr. Yeager described credit unions in the same general area as putting "a limit on the amount of savings that are available for the other types of institutions," including banks and savings and loan associations. At that time Dr. Yeager pointed out that the "credit unions are heavily concentrated along the ship channel area," that "there is great use of credit unions by people who work in industrial plants," and that "from the standpoint of the saver himself, the credit union represents very often, as good or better a way to put his savings as these other two institutions." Credit unions in the area, Dr. Yeager then concluded, afford the "kind of competition that both commercial banks and savings and loans have from the standpoint of the saver's dollar."

The Commissioner's conclusion, set out more fully above, that economic data indicated "availability of substantial savings funds * * * not as yet attracted to either banks or savings and loan associations within the trade area," appears to be grounded on the testimony of Dr. Yeager in similar language that he had "discovered down there that the credit unions of these plants along the ship channel * * have a peculiarity that the people who got

their monies in the credit union have to take it out when they retire from the company," and that appellees' proposed association "would get a volume of savings *peculiar or unique to this particular savings and loan that would not be available to other savings and loan associations,* namely, to people who had finished their twenty or twenty-five years with Shell Oil and so on and would be making their savings available to this association." (Emphasis added)

When objection was made that this conclusion of Dr. Yeager was speculative or hearsay, or both, the witness was asked whether his testimony was based on his "knowledge and observation of the area", to which he replied that it was based on "talking to Mr. Bonnette", one of the charter applicants who was active in Deer Park civic, church, and chamber of commerce work, and to officials of credit unions who gave "general information."

Later when Bonnette testified, as already observed, the hearsay statements of Dr. Yeager regarding savings available from former credit union members, were in no wise affirmed or corroborated by him. Except for the testimony of Dr. Yeager, based entirely on hearsay, that the proposed association would be in a "peculiar or unique" position to tap the savings of retired employees who formerly had their money in industrial credit unions, we find no competent evidence in the record looking in the same direction.

The record shows that Dr. Yeager testified that the conditions and outlook of the area and the projection he made with reference to the same area in another hearing about sixteen months earlier were accurate and were still valid as of the time of the hearing in this case in January, 1969. The conditions and outlook and the witness' projection we set out in summary.

The population of the community then under consideration in October of 1967, was approximately 104,000, which included Pasadena, the principally populated area.

Pasadena had a population of about 20,000 families, and two existing savings and loan associations located in Pasadena had about 9,000 to 10,000 savings accounts. Dr. Yeager considered this fifty-percent saturation of savings accounts "pretty high in terms of representing that the savings industry is serving the public." Dr. Yeager further observed that the heavily populated area of Pasadena was "substantially saturated with people and saturated with services in terms of financial ones." The witness' conclusion then was that a proposed relocation of one association's home office in the built up area of Pasadena would not result in a merely competitive situation but instead would create rivalry between the existing institutions which would be striving to out-bid one another for the same savings amount. This conclusion was based on the possible competition only between two institutions having home offices in Pasadena and did not take into account savings accounts held by other associations with branch facilities in Pasadena, there being at least two others, nor did it include associations having accounts from the area but without facilities actually located in the area.

The Commissioner included in his order a finding of a "total effective buying income for the area of approximately $250 million," apparently based on an estimated figure supplied by Dr. Yeager, who declined to express any opinion at the hearing as to what part of the annual available savings from such yearly income might be secured by savings and loan institutions. A recognized test for approximating the degree of development of the savings and loan industry in an area is to ascertain the population per facility. (See Gerst v. Gibraltar Savings Association, supra, 413 S.W.2d 727, cols. 1–2) The record discloses without dispute that in the trade area under consideration a population of 35,000 for each savings and loan facility in 1960 declined to 12,500 persons per facility in 1968, the year ending shortly before the hearing. Consistent with

this evidence was the uncontroverted testimony of Ward Neff, economist who testified for appellant, that for Harris County the ratio was 20,000 population per facility, but in the proposed trade area the ratio was 13,000 per facility. Considering commercial banks and savings and loan facilities together, the ratio in Harris County in 1968 was 10,700 persons for each facility, and in the proposed area the ratio was 5,300 for each such facility. Savings and loan deposits in the area were shown to be $350 per capita, while in Harris County as a whole such deposits per capita were nearly double that figure, or $660. This comparatively low figure in the area is consistent with other testimony that a significant percentage of the savings in this region finds its way into the numerous nearby industrial credit unions.

Appellees represented to the Commissioner that in order to succeed in the proposed trade area, and to have a profitable operation, the association would need to obtain $2,500,000 in savings deposits in the first year of operation, $1,900,000 in the second year, and $1,500,000 in the third year. This proposal for the first year approaches the actual new savings of $2,740,000 secured in 1968 by Pasadena Savings and Loan Association which had been operating in the same area twenty years and had several established branch offices. The only other association with its home office in the area, appellant with several branches, gained less than $975,000 in new savings in 1968, although it had been operating in the area ten years, and only $500,000 of its new savings in 1968 came from within the proposed trade area.

We have been unable to discover in the record substantial evidence, which is to say the competent evidence required by the Savings and Loan Act, of the availability of substantial savings funds, not yet attracted to either banks or savings and loan associations within the trade area, which will be peculiarly and uniquely available to the proposed association.

The Commissioner, as already pointed out, found not only that substantial savings funds would be available, but also "that the need for mortgage funds in the trade area far exceeds the financial resources of the savings associations which maintain home or branch offices in the trade area." Again it is apparent that the Commissioner's finding was grounded on the testimony of Dr. Yeager who in his economic report stated: "In general, the history of the past 42 months indicates that the need for mortgage funds in the trade area far exceeds the financial resources of the savings associations which maintain home or branch offices in the trade area."

The conclusion reached by Dr. Yeager with respect to need for mortgage funds in the trade area was based by him on the "Dorran Reports" which appellant challenged as hearsay, the admission of which is assigned as error under points 5 and 5A. The "Dorran Reports" were not produced at the hearing, and Dr. Yeager's report based on Dorran purported to be excerpts only selected by him.

The interpretation placed on the "Dorran Reports" compared total volume of mortgage lending, within geographical limits approximately the same as the trade area, with the total of loans made by four savings and loan institutions, two of which had home offices in the area and two of which maintained branch facilities in the trade area. Dr. Yeager on cross-examination admitted that the Dorran figures used by him encompassed all types of building and all types of loans, without regard to whether the type of construction and the type of loan were within the specifications prescribed for savings and loan institutions.

It was shown at the hearing that the Dorran reports employed by Dr. Yeager "include all types of loans—all types of loans represented by deeds of trust on the Harris County records. All types of real estate loans," including, in addition to residence construction, industrial work

such as "pipe line, refinery, what have you * * *" From these total figures, taken from the Dorran sources, Dr. Yeager arrived at a conclusion that the four associations having home or branch offices in the trade area financed about seven to eight and one-half percent of the total mortgage volume. Under further examination Dr. Yeager stated he had not compared these percentages with figures of the same nature in other areas, nor did he have any recognized standard against which to measure this degree of penetration of the market in order to state whether the percentages he found were "high, low, or indifferent." The witness conceded that he "would certainly expect that institutions, other than savings and loans, would finance a tremendous amount of that mortgage lending," and that he did not contend that the savings and loan associations ought to be making all the loans.

No evidence was offered at the hearing to show how much of the total mortgage loan business found in Dorran and adopted by Dr. Yeager was of the type savings and loan institutions could lawfully make. Without this further analysis of the total figures, the Commissioner could only guess whether any of the loans not made by savings and loan associations were of the types that the associations could have made under applicable regulations. Nor was the Commissioner shown what part, if any, of the loans made in the trade area were made by savings institutions that did not maintain facilities within the area but did make loans for improvements within the area.

The record upon which the Commissioner made the finding, that "the need for mortgage funds in the trade area" was "far in excess of the financial resources" of the savings institutions having home or branch offices in the area, contains hearsay and "other species of evidence deemed unreliable" in determining the issue of substantial evidence. Gerst v. Nixon, supra, 411 S.W.2d 357, col. 2. The extent to which the public in the area was being

served by the associations operating within the trade area was not demonstrated by the figures and analyses introduced at the hearing.

Appellees offered testimony at the hearing of new subdivision developments in the area. J. R. McDonald, one of the organizers of the proposed association, testified that he knew of "only about five or six" residences in Harris Subdivision, but with respect to some "12 or 15 [subdivisions] in this general area" he could not be specific as to names, dates of openings, or the number of homes constructed in each of the subdivisions. Dr. Yeager in his written report referred to a subdivision of "about 120 homes" and "10 acres * * * to be developed with multiple unit apartment buildings" which together would "add more than 500 new households in the immediate neighborhood of the new savings association in less than two years." But under examination at the hearing Dr. Yeager confessed that he had no definite information with respect to these subdivisions and did not know whether these developments would occur.

Tommy Adkins, president of appellant association, testified that in 1960, when Southmore Savings started business, approximately one thousand single family residential lots were developed and ready for building, but that in the year 1968 the number of such lots declined to two hundred, or to two hundred and fifty "at the most". Adkins pointed out that savings and loan institutions were restricted "from making more than eighteen percent of * * * total assets into commercial loans, personal loans, raw land loans, lot loans and subdivision loans," and stated that as a result his association since 1966 had held commercial loans, raw land, and lot loans to less than $100,000 a year. Adkins added that " * * * about the only type of real estate loans that an association can make without getting involved into the eighteen percent" are loans for "churches and single family residences."

Uncontroverted evidence is in the record that permits for single family building, considered basic structures for savings and loan lending, have been declining in the Pasadena area. In Pasadena, Deer Park and South Houston, the approximate trade area, single family dwelling permits in 1960 reached 705, declining to 655 in 1965, and to 527 for 1968. The same trend was reflected in electrical connections, which declined from 555 in 1960 to 465 in 1965 and to 408 in 1967.

We do not find in the record evidence of a substantial or obvious community need for the proposed association in the light of attendant circumstances revealed by the competent testimony and documentary proof.

Appellees proposed to fortify the loan stance of the proposed association by purchasing $1,600,000 in loans when the institution opened for business. W. E. Frazier, designated the managing officer for the new association, when questioned at the hearing was unable to give the source or location of the loans to be bought. Frazier admitted that no effort had been made to line up the loans and did not know where the properties would be located, although it was hoped, he said, that the loans could be bought in Harris County, and, "We would do our best to get them in our area."

Similar proposal was made by applicants for a charter in Gerst v. South Central Savings and Loan Association, et al. (Nos. 11,508 and 11,510, unpublished opinion of this Court filed April 19, 1967, writ ref. n. r. e. October 4, 1967, reh. den. November 1, 1967). In that case request was made for identity of the loans which the applicants represented were available in the area, but applicants failed, or were unable, to make any such identity. This Court there sustained action of the Commissioner in refusing the application for charter. Though failure of applicants to identify the loans was not in itself controlling in the decision, it seems clear there, as in this case, that without some specific designa-

tion of the loans, the proposal to acquire loans as part of a plan to insure a profitable operation, can be no more than an intention to try and a hope for success, without showing reasonable probability that the proposed loans are actually available.

The record shows that appellees projected an income of $112,000 for the first year from the loans, if loans amounting to $1,-600,000 could be bought bearing interest at seven percent. Loss for the first year in such event would be $5,000, but if only half the loans could be purchased, the loss would be $61,000. We find no evidence in the record that the loans appellees proposed to purchase, in order to have a profitable operation, would be a part of "the volume of business in the community in which the proposed association will conduct its business," or that the funds with which to purchase the loans would come from the community of operation. Art. 852a, sec. 2.08(3).

The Commissioner found that "the evidence presented indicates that no undue harm would result to any other savings and loan facility from the operation of the proposed association." This conclusion is followed in the order by generalizations to the effect that "existing associations are healthy and well managed" and creation of a new association would "not substantially inhibit future growth," without setting out the evidence referred to as supporting the conclusion.

In passing on the question of undue harm to existing institutions, the Commissioner, in order to find such harm, must conclude that chartering the proposed new association would provide excessive competition for existing associations which would result in undue harm to them. Gerst v. Cain, 388 S.W.2d 168 (Tex.Sup.1965).

In this case only appellant, Southmore Savings and Loan, urges that grant of the charter to appellees would result in undue harm to it.

The record shows that in 1965 a group of organizers, essentially identical with the appellees, applied for a federal charter to operate in the neighborhood of the location sought for the proposed association in this case. About the same time in 1965 Southmore Savings was applying for a branch office at a location a short distance from the site proposed in 1965 for the federal charter and now proposed for the state charter. The application for federal charter in 1965 was denied, but the State Commissioner granted Southmore's application for the branch office.

At the hearing before the State Commissioner in 1965, which was held prior to final action on the federal application, applicants for the federal charter, including W. E. Frazier, now the designated managing officer for appellees, appeared before the Commissioner in opposition to approval of the Southmore branch. The contention of Frazier and associates was that if they were successful in obtaining a federal charter and Southmore obtained a branch nearby, the two institutions would be thrown in "a rat race for the same savings funds."

Between 1965 and the date of hearing before the Commissioner in this case competitive efforts to garner available savings funds in the area became substantially more intensive, and the view in 1965 that location of two savings facilities in the neighborhood in question would result in a "rat race" for the same savings funds remains reasonably valid, with the logical implication that another facility would bring about excessive competition and undue harm to the existing branch. We find no evidence of a substantial nature supporting the negative finding by the Commissioner of no undue harm.

We have examined and considered the entire record in determining whether the order of the Commissioner is reasonably supported by substantial evidence. The task, as already suggested, has not been

lightened or facilitated by the volume of hearsay and other species of evidence in the record deemed unreliable.

■ It is neither practical, nor is it the function of the courts, to lay down rules fixing an inflexible level of tolerance for the percentage of hearsay and other incompetent evidence allowable in a record of administrative proceedings. But when the hearsay reaches such proportion that in the opinion of the court the action of the administrative agency was substantially influenced by the hearsay or other incompetent evidence, the order of the agency ought to be set aside. Any evidence, whether it is hearsay, nebulous, or simply incredible, is offered for the same purpose that relevant and competent evidence is offered, which is to influence the thinking and decision of the agency or court empowered to hear and decide the matter at hand.

The expertise of the Commissioner is essentially the exercise of sound judgment in examining, weighing, and evaluating relevant facts tending to establish or disprove public need, probability of profitable operation, and undue harm to existing facilities, upon which determinations rest orders granting or refusing applications for charters and branch offices. If the facts to show the affirmative or the negative of these issues are not available, the void cannot be filled by hearsay or other species of evidence deemed unreliable.

■ We hold that the record does not contain substantial evidence supporting the Commissioner's findings of public need, volume of business sufficient to indicate a profitable operation, and absence of undue harm to existing associations.

We reverse the judgment of the trial court sustaining the order of the Commissioner and render judgment setting aside the order as not being supported by substantial evidence.

Reversed and rendered.