**W. Sale LEWIS et al.**

**v.**

**SOUTHMORE SAVINGS ASSOCIATION.**

**No. B–2813.**

Supreme Court of Texas.

April 5, 1972.

Rehearing Denied June 7, 1972.

Crawford C. Martin, Atty. Gen., John H. Banks, Asst. Atty. Gen., Alvis & Carssow,

C. E. Alvis, Jr., Rogers & Hughes, Johnnie B. Rogers, Graves, Dougherty, Gee, Hearon, Moody & Garwood, Robert J. Hearon, Jr., Austin, for petitioners.

Thomas F. Lay, Pasadena, Heath, Davis & McCalla, Dudley D. McCalla, Austin, for respondent.

McGEE, Justice.

Charter application was filed pursuant to the Texas Savings and Loan Act, Article 852a, Vernon's Ann.Civ.St., under the proposed name of Modern Savings and Loan Association to be located at 3905 Spencer Highway in Pasadena. A hearing on the application was conducted by the Savings and Loan Commissioner (Commissioner) and all the necessary findings required by Article 852a were made. The application was approved and an order so entered. Respondents then appealed to the district court which rendered judgment upholding the order of the Commissioner. The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment that the application be denied. 467 S.W.2d 226. We reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

Art. 2.08 of the Texas Savings and Loan Act, supra, provides that the "Commissioner shall not approve any charter application unless he shall have affirmatively found from the data furnished with the application, the evidence adduced at such hearing and his official records" the existence of the following prerequisites, only two of which are in issue here. They are:

"(3) there is a public need for the proposed association and the volume of business in the community in which the proposed association will conduct its business is such as to indicate a profitable operation.

"(4) the operation of the proposed association will not unduly harm any existing association."

The Commissioner entered his order approving Modern's application. The order states:

"The Commissioner further finds that there is a public need for an additional savings and loan association in Pasadena, Texas; that the volume of business . . . is such as to indicate a profitable operation; and the Commissioner further finds that the operation of the proposed Modern Savings and Loan Association will not unduly harm any existing association."

The Commissioner, on the issues of (1) public need, (2) volume of business, and (3) no undue harm, respectively, detailed the underlying facts supporting his findings:

"(1) the economic data submitted indicates the availability of substantial savings funds which have not as yet been attracted to either banks or savings and loan associations within the trade area. Also, the evidence shows that the need for mortgage funds in the trade area far exceeds the financial resources of the savings associations which maintain home or branch offices within the trade area.

"(2) the area shown by the testimony as the normal trade area for the proposed association is the Pasadena, Deer Park, and South Houston area. Since 1960 the trade area has had a population growth of approximately 47%, with over 100,000 persons now residing in this area, which is primarily residential in character. . . . Principal commercial activity is related to serving consumer needs and at present more than 1,600 firms operate within the trade area with retail sales in excess of $135 million. The average household income for the trade area is in the range of $9,000 to $9,500 with total effective buying income for the area of approximately $250 million. It is estimated that this total should increase by 8% to 10% per year for the foreseeable future. . . . Total deposits in trade area banks have increased from approximately $49 million in 1960 to over $117 million by year end 1967. Combined savings and bank deposits in the area were roughly $145 million by 1968. Further, since 1960 the combined deposits have increased 160% while population has increased 47%.

"(3) the size and growth of the population of the trade area, coupled with the present and anticipated income of such area, indicate and support the need for and profitability of the proposed new savings associations. Further, the evidence presented indicates that no undue harm would result to any other savings and loan facility from the operation of the proposed association. . . . In this regard, of the two associations having home offices in the proposed trade area, Southmore Savings Association and Pasadena Savings Association, savings have increased 370% since 1960 and approximately 74% since 1963."

The question in the instant case is the type and quality of evidence necessary to constitute substantial evidence to support the Commissioner.

 Respondent, contestant, had the burden of proving that the order of the Commissioner was not supported by substantial evidence as it appears in the record of the hearing before the Commissioner, which record is made the basis of review by the District Court. Gerst v. Nixon, 411 S.W.2d 350 (Tex.1966); § 11.12 Texas Savings and Loan Act. Art. 852a, V.A.C.S. The order of the Commissioner is presumed to be a valid exercise of the power and discretion conferred on him. Gerst v. Guardian Savings and Loan Association, 434 S.W.2d 113 (Tex.1968).

Petitioners present five points of error in this Court under which they seek to support the Commissioner's findings. Their five points are briefed together and assert that there is in the record evidence of sufficient quality to support the Commission-

er's findings on subdivisions (3) and (4) of § 2.08 of Art. 852a. We do so hold.

Our opinion in Benson v. San Antonio Savings Association, 374 S.W.2d 423 (Tex.1963), is quoted by the Court of Civil Appeals as saying: "Even official writings admissible in evidence by reason of Article 3731a, Sec. 1, Vernon's Ann.Civ.Stat., may be necessarily hearsay and cannot serve to show that the Commissioner's order was supported by substantial evidence." In *Benson*, the unsuccessful applicant contended that the exclusion of an investigative report by the Commissioner was grounds for reversal by the Court in applying the substantial evidence rule. The specific holding in *Benson* was that there was substantial evidence to support the order of the Commissioner. Whether the excluded testimony was or was not admissible, it could not subtract from the substantial evidence already in the record. Hence admissibility of the report was immaterial. Likewise, in this case, there is substantial evidence, based on personal knowledge of the lay and expert witnesses, to support the judgment of the trial court irregardless of the supportive testimony now attacked as hearsay. The rule laid down in Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424 (1946) and followed in *Benson* is that the record is to be considered as a whole.

In Texas the substantial evidence review had its origin in Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W.2d 505 (1934). There the Court stated the rule to be that decisions of the Commission:

". . . should be final and conclusive, unless it acted unreasonably and unlawfully, or unless its decisions had no basis in fact and were arbitrary or capricious. In other words, if the findings and orders of the Railroad Commission in such matters had any reasonable basis in fact, and were not shown to be arbitrary and unreasonable, they must be supported by the court."

The rule was further clarified in Trapp v. Shell Oil Co., supra, to be that the Commission's order would be upheld if the prevailing party could produce substantial evidence in support of the order. The court determines from all of the evidence before it, the entire record, whether the Commissioner's action is or is not reasonably supported by substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the Court. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942); Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338 (1948); Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198 (1949); Guinn, Administrative Law, 24 Southwestern Law Journal 216 (1970); Guinn, Judicial Review of Administrative Orders, 23 Baylor Law Rev. 34 (1971).

The word "reasonably" has been deliberately used in the statement and its use gives to the judicial review a broader scope than it would have if *some* evidence were regarded sufficient to sustain the Commission's order. Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420 (1946); Trapp v. Shell Oil Co., Inc., supra; Hawkins v. Texas Co., supra.

In applying the Texas substantial evidence review to savings and loan cases, this Court in Bay City Fed'l Savings and Loan Ass'n v. Lewis, Commissioner, 474 S.W.2d 459 (Tex.1971), we held "that review of the Commisioner's findings is not by a preponderance of the evidence test, because 'the court would be in the attitude of impermissibly substituting its judgment for the expertise of the administrative officer in the exercise of his statutory discretion.' Gerst v. Goldsbury, 434 S.W.2d 665, 667 (Tex.Sup.1968). It was said in that case: 'Where there is substantial evidence which would support either affirmative or negative findings, the order must stand, notwithstanding the Commissioner may have struck a balance with which the court might differ.'" The original provision which purported to vest in the judiciary the power to redetermine the issues of

Art. 852a, § 2.08(3), (4) was struck down as being unconstitutional in Gerst v. Nixon, 411 S.W.2d 350 (Tex.1967).

■ Each substantial evidence case must be decided on its own facts. Gerst v. Cain, 388 S.W.2d 168 (Tex.1965); Gerst v. Oak Cliff Savings & Loan Association, 432 S.W.2d 702 (Tex.1968). Modern presented eight witnesses in support of the application: J. R. McDonald, a resident of Pasadena for twenty-two years, active in business and community affairs, and Chairman of the Board of the Pasadena National Bank; V. E. McDaniel, a seventeen-year resident and travel agency operator; George A. Thompson, Superintendent of Schools of the Pasadena Independent School District; Dr. Sebron Williams, Superintendent of Schools of the Deer Park Independent School District; Dr. Francis S. Yeager, an independent research economist; W. E. Frazier, a thirty-year resident of Pasadena during which time he has been in the finance business, including executive positions with the Pasadena State Bank and Pasadena Savings and Loan Association; J. P. Bonnette, Jr., an eighteen-year resident of Deer Park in the general insurance business; L. C. O'Connor, who has been in the real estate business in Deer Park since 1953; and John O. Harris, a Pasadena realtor and developer. The contestants before the Commissioner presented three witnesses: Maurice L. Barclay, Managing Officer of the Pasadena Savings Association; Tommy Adkins, President of Southmore Savings Association in Pasadena; and Ward Neff, a real estate consultant employed by Southmore Savings. Dr. Yeager and Mr. Neff presented expert testimony before the Commissioner. As stated earlier, both experts used many of the same source materials.

In addition to other direct evidence on public need, Mr. McDonald from his local banking experience testified as to his knowledge of increased housing loan demand, including a number of requests his bank could not fill and which were not filled by financial institutions in the area. He stated that in his opinion there was a public need for a new savings association. Dr. Yeager, on the basis of his study, concluded that: "The trade area is now large enough and is growing rapidly enough to need an additional savings association at this time. The needs of households as savers, and of households as investors in new residential capital, are such that they cannot be met adequately by the two existing home offices and the six branch offices of Pasadena and Houston savings association." Dr. Yeager supported his opinion, in part, with a statistical analysis demonstrating that the need for mortgage money in the trade area exceeds the financial resources of the existing savings associations. It was also pointed out that the Southmore Savings office on Spencer Highway is a branch office only, which cannot serve the public to the same degree as the home office of a new association. Dr. Yeager testified that in his opinion the new association would within a reasonable time acquire $1 million in new savings. Further, he stated the fact that another $1 million in permanent capital of the new association had been subscribed on a broad basis of ownership. This supported his view of public need, a conclusion that he several times repeated.

Mr. Bonnette testified from his experience in writing insurance policies in the trade area that 90 percent of the mortgages are from outside the area. This testimony was corroborated by that of Mr. O'Connor who reported that less than 10 percent of the transactions in which he participates through his real estate business involve mortgagees in the trade area.

In regard to evidence of profitability, Mr. Frazier presented a budget for the proposed association which he deemed conservative. He estimated that the association would have savings of $2.5 million at the end of the first year, $4.4 million at the end of the second year, and $6.45 million at the end of three years. Dr. Yeager expressed his opinion that the new associa-

tion would be profitable, as did Mr. Bonnette. Evidence was submitted of the very substantial sums on deposit in banks to the credit of the organizers in payment for stock subscriptions in the new association, and a list of the stock subscriptions was introduced, showing that subscriptions in the total amount of $1 million to the stock of the proposed association had come from 137 people from practically every walk of life.

Mr. McDonald, based on his extensive financial experience in the community, his knowledge of and involvement in the planning activities of the City, and his knowledge of the direction of growth of the City (including the move of the bank of which he is Chairman of the Board), expressed the opinion that a new savings and loan office would not unduly harm any other financial institution. He pointed out that there are adequate potential savings to compete for in the community, and that healthy competition for these funds would be good for other institutions. Dr. Yeager testified that there is enough potential business for profitable operation, and that no undue harm to other savings associations would result from Modern.

▆▆ In Texas the hearsay rule applies in administrative hearings just as it does in court. And it is a rule that forbids the reception of evidence rather than one that merely goes to the weight of the evidence. It should quickly be added that in administrative hearings considerable discretion is permitted in allowing evidence to be introduced by virtue of the liberal exceptions to the rule.

▆ An example of an exception to the rule which the Savings and Loan Commissioner might meet frequently is the one which admits publications of market prices or statistical compilations which are generally recognized as reliable and regularly used in a trade or specialized activity by those persons so engaged. When this predicate is proven, these publications are admissible for the truth of the matter published. McMillen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123 (Tex.Civ.App. 1966, writ ref'd n. r. e.) (tables of growth of turkeys published in magazine "Turkey World"); City National Bank in Wichita Falls v. Kiel, 348 S.W.2d 260 (Tex.Civ. App.1961, writ ref'd n. r. e.) (National Quotations Bureau daily quotation sheet with bid and ask prices of over-the-counter stocks); Houston Packing Co. v. Spivey, 333 S.W.2d 423 (Tex.Civ.App.1960 no writ) (newspaper publication of market prices of chickens); Western Union Telegraph Co. v. Eckhardt, 2 S.W.2d 505 (Tex.Civ.App.1927) *modified* 11 S.W.2d 777, reh. den. 20 S.W.2d 759 (Tex.Com. App.1929) (Reach's 1926 Baseball Guide to prove beginning and ending dates of baseball season); Western Union Telegraph Co. v. Gilliland, 61 Tex.Civ.App. 185, 130 S.W. 212 (1910, writ ref'd) ("Texas & Oklahoma Railway and Hotel Guide" to prove railroad time-table); Model Code of Evidence, Rule 528; The Uniform Rules of Evidence, Rule 63(30).

▆ Both sides called expert witnesses before the Commissioner. Both Dr. Yeager, called by the Petitioner, and Mr. Neff, called by Respondent, gave the sources from which they derived their respective opinions. Books, governmental publications, commercial bank publications, corporate reports, and personal interviews were relied upon by both experts to reach their result and neither contested the reliability of the publications. Dr. Yeager also testified from his own personal knowledge. An expert, when qualified as such, may give his opinion and relate sources which are customarily and usually relied upon by experts in the field upon which he partially relied in forming his opinion, together with his own personal knowledge, which support or tend to support that opinion. Loper v. Andrews, 404 S.W.2d 300 (Tex.1966); State of Texas v. Oakley, 163 Tex. 463, 356 S.W.2d 909 (Tex.1962); Martin v. Wholesome Dairy, Inc., 437 S.W.2d 586 (Tex.Civ.App.1969 ref'd n. r. e.); Bryant v. Trinity Universal Insurance Company,

411 S.W.2d 945 (Tex.Civ.App.1967 ref'd n. r. e.); Coffee v. William Marsh Rice University, 408 S.W.2d 269 (Tex.Civ.App.1966 ref'd n. r. e.); Schooler v. State, 175 S. W.2d 664 (Tex.Civ.App.1943 ref'd w. o. m.); McCormick and Ray, Texas Law of Evidence, Secs. 835, 1400, and 1404; Rayburn, Texas Law of Condemnation (1960), §§ 125 and 126; Expert and Opinion Evidence, Vol. 31, Am.Jur.2d, Secs. 26, 27. Thus, the Commissioner properly considered the supportive testimony in testing the weight and credibility of the expert opinion. The expert's hearsay is not evidence of the fact but only bears on his opinion. In a jury trial, the jury must be so instructed. The judge or administrator should acknowledge the limited purpose, and he should attempt to observe it. The expert may not rely on just *any* hearsay. The appraiser may not use the price of a comparable sale overheard on the street from a stranger unless verified from sources recognized as authoritative by experts of the field. The economist may not base his opinion on figures on a sheet which the stranger drops unless such figures are properly verified by credible sources recognized in the field. The hearsay source should be acceptable to the members of the expert's profession or class, and it should be confirmed insofar as that is practical. There should be some necessity for allowing the expert to use hearsay information and some justification for receiving his opinion when his information is not proven. See Giles v. Ponder, 275 S.W.2d 509 (Tex.Civ.App.1955) aff'd Rudder v. Ponder, 156 Tex. 185, 293 S.W.2d 736 (Tex.1956); Bryant v. Trinity Universal Ins. Co., supra.

■ Respondents complain because the publications of the U.S. Department of Commerce, the Securities and Exchange Commission, the Federal Reserve Board, and the various banks mentioned by Dr. Yeager were not made available to them at the Commissioner's hearing. There is no showing that there was anything secret about these reports or that any one of them was not available to the parties at all times for the mere asking. Respondent, as a member of the general public, had the same opportunity before and during the hearing to acquire the publications. No claim of harm or element of surprise was shown by Respondent regarding the public reports. However, if the hearsay is taken from a private report or publication which does create a surprise, that writing should be made available for examination by the adversary. *Cf.* Powhatan Mining Co. v. Ickes, 118 F.2d 105 (6th Cir. 1941); Davis, Administrative Law Treatise, § 14.15 (1958 p.p. 1965). The expert should be allowed to give the full benefit of his expertise without undue interference from legal exclusions that his fellow specialists would regard as limitations upon disclosure; the expert should not be allowed to hide behind his choices and conclusions any more than is necessary and should be exposed to maximum cross-examination.

■ A useful analogy is presented by the rule as to testimony summarizing the contents of voluminous documents. The witness may testify of his extractions or of a net balance of accounts, but the full documents or records must "be placed at hand in court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available." 4 Wigmore, Evidence § 1230 (3d ed. 1940). The Texas cases require that the source records be admissible and be produced. Dallas Railway & Terminal Co. v. Guthrie, 146 Tex. 585, 210 S.W.2d 550 (1948); Sherwin-Williams Co. v. Perry Co., 424 S. W.2d 940 (Tex.Civ.App.1968, writ ref'd n. r. e. with per curiam opinion 431 S.W.2d 310); Sam Bloom Advertising Agency v. Brush, 284 S.W.2d 265 (Tex.Civ.App.1955, no writ).

■ The record reflects competent direct evidence, a part of which is set out above, which supports both disputed findings of the Commissioner. It is within the

discretion of the Commissioner to admit and consider the expert opinion by considering the weight and credibility of the supporting evidence which formed the basis for his opinion. That testimony as to the basis for the opinion is not hearsay in the true sense.´ State of Texas v. Oakley, supra.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court upholding the order of the Commissioner is affirmed.

CALVERT, C. J., and WALKER, STEAKLEY, POPE, REAVLEY and DANIEL, JJ., concurred in result.