Timothy and Nancy **KAHANEK**, Individually and as Personal Representatives of the Estate of Kyndil Kahanek, Appellants,

v.

James H. **ROGERS** Jr., M.D., Gordon H. Barth, D.O., and Gordon H. Barth, D.O., d/b/a Yorktown Medical Clinic, Appellees.

No. 04–98–00614–CV.

Court of Appeals of Texas,
San Antonio.

Oct. 13, 1999.

Rehearing Overruled Dec. 27, 1999.

Valorie W. Davenport, Neda S. Yassaei, Davenport/Goranson, L.L.P., Houston, for Appellants.

John D. Ellis, Brad A. Allen, John D. Ellis & Associates, Houston, W. Richard Wagner, R. Blake Zuber, Patterson & Wagner, L.L.P., San Antonio, for Appellees.

Sitting: TOM RICKHOFF, Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by: TOM RICKHOFF, Justice.

Timothy and Nancy Kahanek sued Drs. Gordon Barth and James H. Rogers Jr. for medical malpractice in the death of their daughter Kyndil. After a jury trial, the trial court entered judgment on a verdict in favor of the doctors. In four issues presented the Kahaneks complain that the trial court's pretrial and evidentiary rulings caused rendition of an improper judgment. We affirm the judgment of the trial court.

### FACTS AND PROCEDURAL HISTORY

Seven-year-old Kyndil Kahanek died in 1993 from cardiac arrest. The Kahaneks contended that Drs. Barth and Rogers were negligent in prescribing and monitoring blood levels of Tegretol, an anti-seizure medication. Dr. Barth was their general practitioner and Dr. Rogers, a pediatric cardiologist, saw Kyndil to treat her underlying cardiac condition in 1990 and 1992.

Kyndil's medical history included heart surgery at four months of age to correct a congenital heart defect. After an episode of seizures at the age of four, a pediatric neurologist examined Kyndil

and prescribed Tegretol, an anti-seizure medication.[1] After another episode, the neurologist increased her Tegretol dose. According to the Physicians' Desk Reference, which all parties acknowledge is relied on by physicians, Tegretol should be given to cardiac patients only after a "critical benefit-to-risk appraisal" is conducted. Dr. Barth began refilling Kyndil's Tegretol prescription about a year before her death.

After Kyndil's death, her blood Tegretol level was found to be elevated; while the normal therapeutic level for the drug was .8 to .12, her blood level at that time was .17.[2] The Kahaneks contend this higher-than-normal level triggered the arrhythmias which caused her death, and that Drs. Barth and Rogers were negligent in failing to adequately monitor and warn of the shortcomings of Tegretol in a cardiac patient like Kyndil. Ten members of the jury disagreed, finding that Drs. Barth and Rogers were not negligent in Kyndil's death.

### EXPERT WITNESS TESTIMONY

In their first and second points of error the Kahaneks complain that the trial court abused its discretion by unduly restricting one of their expert witnesses to the wording of his report while permitting the defendants' expert much greater latitude. The exchange in question involved the Kahaneks' contention that if Kyndil's Tegretol level had been properly monitored by the doctors, the dosage could have been decreased, which would have decreased the toxicity, which would have reduced the risk to the patient.

The heart of the dispute concerns restricting the Kahaneks' expert, Dr.

---

1. The Kahaneks also sued the pediatric neurologist. *See Kahanek v. Gross,* 981 S.W.2d 271 (Tex.App.-San Antonio 1998), *aff'd in part & rev'd in part, Gross v. Kahanek,* 3 S.W.3d 518 (Tex. 1999).

2. Significantly, the issue of the PDR in question also indicated that "[blood] levels of Tegretol are variable and may range from 0.5–25 [micrograms per milliliter of blood], with no apparent relationship to the daily intake of the drug. Usual adult therapeutic levels are 8–12 [micrograms per milliliter of blood]."

Charles Bessire, to the affidavit he filed in opposition to Dr. Barth's motion to strike another expert. (This was the only expert report filed by him before trial.) In that affidavit, Dr. Bessire stated that "[g]iven her cardiac history, it is **possible** that toxic levels of Tegretol could cause serious cardiac complications." (emphasis added). Dr. Bessire was not deposed, and at trial the defendants sought to limit him to testifying as to the "possibility" that Tegretol levels contributed to Kyndil's death, rather than a "reasonable medical probability," which is the standard for proof in medical malpractice cases. *See Parker v. Employers Mut. Liability Ins. Co. of Wisconsin,* 440 S.W.2d 43, 46–47 (Tex.1969).

After a lengthy bench conference on the defendants' objections, the judge informed the Kahaneks' counsel that she would "have to phrase it in possibilities." But the judge also stated, "I'm not going to sustain the objection to reasonable medical. I'm going to let you get by with that even if it's not in the report, okay? If that's going to be their objection, I'm not going to sustain it; okay?" When questioning resumed, the Kahaneks' counsel was permitted to ask the following questions:

- In reasonable medical probability, if Kyndil's parents had brought her in with the signs of Tegretol toxicity, would standard medical care require that blood tests be done to determine whether or not the child was in fact toxic?
- In reasonable medical probability, if you reduced the Tegretol level below the point that it was toxic, would that reduce the possibility of the risk to the child?
- And certainly if the Tegretol is toxic, that once you take it out of the toxic level then that would certainly reduce, to some extent, the risk?

- And [following up on the answer to the prior question] that answer is in reasonable medical probability?

It is thus apparent that the trial judge's ruling did not preclude Dr. Bessire from expressing his opinion that reducing the level of Tegretol would have reduced the risk to Kyndil. We therefore overrule the Kahaneks' first issue.

■ As for the second issue, we note that while the Kahaneks complain that defense expert Dr. Alexander Shepherd was permitted to testify outside his report, he was vigorously cross-examined by the Kahaneks on these issues; counsel therefore waived any complaint as to his testimony on those points. *See, e.g., Allied Gen. Agency Inc. v. Moody,* 788 S.W.2d 601, 607 (Tex.App.—Dallas 1990, writ denied); *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595, 612 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). We therefore overrule the Kahaneks' second issue.

### DOCKET CONTROL ORDER

■ In their third issue the Kahaneks complain the trial court erred in its handling of the docket control order. They contend that since the original trial setting for which the order was issued was delayed for eight months, they should not have been held to those discovery deadlines; and that they therefore should have been permitted to supplement with another expert.

The Kahaneks designated Dr. Richard S. Blum as an expert some 32 days before trial. This designation was vigorously contested by defendants; the trial court enforced the prior docket control order and Blum never testified.[3] Dr. Blum was not deposed, and no expert's report was filed until the motion for new trial. Thus, the Kahaneks failed to preserve this issue for review. *See* Tex.R. Evid. 103; *McInnes v. Yamaha Motor Corp.,* 673 S.W.2d 185, 187

---

3. The Kahaneks sought mandamus relief on this point before trial; leave to file was denied in both this court and the Supreme Court.

*See Kahanek v. Tanner,* No. 04–97–00471–CV (Tex.App.—San Antonio June 26, 1997, orig. proceeding [leave denied] ).

(Tex.1984); *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex.App.-Amarillo 1989, writ denied). Moreover, reading Dr. Blum's report in the motion for new trial leads us to the conclusion that his testimony also would be cumulative of testimony by Dr. Schraeder. We therefore overrule the Kahaneks' third issue.

## LEARNED TREATISES

■ In their fourth issue, the Kahaneks complain that the trial court improperly classified the Physicians' Desk Reference ("PDR") as a learned treatise under TEX.R. EVID. 803(18), instead of as a market report or commercial publication under TEX.R. EVID. 803(17). The difference in treatment between these classifications is significant. A market report or commercial publication is received for the truth of the matter asserted, which permits the jury to take the document into the jury room. *See Lewis v. Southmore Sav. Ass'n,* 480 S.W.2d 180, 186 (Tex.1972). A learned treatise, on the other hand, is admissible only in conjunction with an expert's testimony and may not be taken into the jury room. *See* 2 STEVEN GOODE ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 803.23 (Texas Practice 1993 & Supp.1999) and cases cited therein.

We believe the hearsay exception embodied in TEX.R. EVID. 803(17) is not intended for a compilation such as the Physicians' Desk Reference. One commentator on the identically worded federal rule noted that this exception was developed for information that is readily ascertainable and about which there can be no real dispute. *See* 4 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE § 803(17)[01], at 803–360 (rev.1994). Another commentator argues this exception should be limited to "objective facts furnished under a business duty to transmit." 31 MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6768 (2d interim ed.1997). Texas's acceptance of these criteria can be seen in the examples for the common-law hearsay exception listed in *Lewis*—growth charts of turkeys, daily stock price quote sheets, newspaper publication of the market prices of chickens, a baseball guide admitted to show the beginning and ending dates of the baseball season, and a travel guide admitted to show railroad timetables. *Id.* at 186 (citations omitted).

■ On the other hand, as testimony in this case proves, the compilation of drug information embodied by the Physicians' Desk Reference goes beyond objective information to items on which learned professionals could disagree in good faith. We believe this publication is more closely analogous to safety codes, which are complex and technical bodies of work containing the opinions of experts which could be subject to revision. *See* WEINSTEIN, *supra* at 803–363 to 803–364 (arguing federal rule 803(17) is inapplicable to such material). We find this persuasive and hold that the PDR is better classified as a learned treatise rather than a compilation of market material.[4] The trial court therefore did not err in barring entry of the PDR itself into evidence. We overrule the Kahaneks' final issue.

The judgment of the trial court is in all things AFFIRMED.

---

**4.** This conclusion is buttressed by one federal court's finding that the PDR was not admissible under Rule 803(17) *or* 803 (18) of the Federal Rules of Evidence. *In re Richardson-Merrell, Inc. Bendectin Prods.*, 624 F.Supp. 1212, 1230–1232 (S.D.Ohio 1985), *aff'd,* 857 F.2d 290 (6th Cir.1988).